IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 20-3580

CENTER FOR BIOLOGICAL DIVERSITY, and
WESTERN WATERSHEDS PROJECT,

      Plaintiffs,

v.

U.S. DEPARTMENT OF THE INTERIOR; DAVID BERNHARDT, in his official capacity as
Secretary of the U.S. Department of the Interior; U.S. FISH AND WILDLIFE; AURELIA
SKIPWITH, in her official capacity as Director of the U.S. Fish and Wildlife Service; BUREAU
OF LAND MANAGEMENT; WILLIAM PENDLEY, in his official capacity exercising the
authority of the Director of Bureau of Land Management; U.S. FOREST SERVICE; VICKI
CHRISTIANSEN, in her official capacity as Chief of the U.S. Forest Service; NATIONAL
PARK SERVICE; MARGARET EVERSON, in her official capacity exercising the authority of
the Director of the National Park Service.

      Defendants.

---

## PETITION FOR REVIEW OF AGENCY ACTION

---

## INTRODUCTION

1.      The Gunnison sage-grouse (*Centrocercus minimus*), listed as threatened under the

Endangered Species Act ("ESA"), exists nowhere else in the world except for the rapidly-

disappearing sagebrush ecosystems of southwest Colorado and southeastern Utah. The heart of

the species' range is Colorado's Gunnison Basin and the majority of its remaining population

lives there. Since 2013, the Gunnison sage-grouse has declined by nearly 50 percent rangewide,

and by over 40 percent in the Gunnison Basin. Despite these catastrophic population losses, the

U.S. Fish and Wildlife Service ("FWS"), the Bureau of Land Management ("BLM"), the U.S.

Forest Service ("Forest Service"), and the National Park Service ("NPS") (collectively "Defendants")—federal agencies responsible for conserving the species and its habitat—have done little to protect its last viable population in the Gunnison Basin from the significant threat posed by livestock grazing. Instead, the agencies purportedly rely on outdated conservation measures from the Gunnison Basin Candidate Conservation Agreement ("Gunnison Basin CCA") and its attendant Biological Opinion—but those measures have not been consistently applied or enforced and have never been based on the best available science.

2.      Petitioners, Center for Biological Diversity and Western Watersheds Project (collectively, "Conservation Organizations"), bring this lawsuit against Defendants over their failure to ensure that the adoption and implementation of the Gunnison Basin CCA does not jeopardize the continued existence of the Gunnison sage-grouse or adversely modify its critical habitat in violation of the ESA. Petitioners also challenge the Gunnison Basin CCA's Biological Opinion as arbitrary and capricious and contrary to the best available science.

3.      Pictured below, the Gunnison sage-grouse is a unique species of sage-grouse now confined to a small fraction of its historic range due to threats including habitat destruction primarily caused by livestock grazing and residential development.



4.      The agencies developed the Gunnison Basin CCA in 2013 after FWS proposed to list the Gunnison sage-grouse as endangered and designate 1.7 million acres of critical habitat for the bird. The Gunnison Basin CCA was intended to protect BLM, the Forest Service, and NPS from liability for incidental take to the Gunnison sage-grouse from development, recreation, and livestock grazing authorized by the agencies in the species' occupied critical habitat in the event that the species should be listed, and to specify needed conservation measures and monitoring.

5.      While they were developing the Gunnison Basin CCA, BLM, the Forest Service, and NPS purported to analyze the effects of the Gunnison Basin CCA on the Gunnison sage-grouse and its occupied critical habitat in a biological assessment, which they presented to FWS for expert review. On July 30, 2013, FWS adopted the biological assessment's analysis in a "conference opinion," intended to advise the agencies on ways to minimize or avoid adverse effects to Gunnison sage-grouse from implementing actions covered under the CCA.

6.      Subsequently, in November 2014, FWS listed the Gunnison sage-grouse as a threatened species under the ESA and designated 1.4 million acres as its critical habitat, including 500,909 acres of occupied critical habitat in the Gunnison Basin. Less than three weeks later, FWS adopted the conference opinion's analysis of the Gunnison Basin CCA's effects on the Gunnison sage-grouse and its critical habitat in a formal "Biological Opinion"—the culmination of the "consultation" process mandated by the ESA. *See* 16 U.S.C. § 1536.

7.      FWS, through the Biological Opinion, concluded that, although certain authorized activities such as livestock grazing were likely to adversely affect the Gunnison sage-grouse, the Gunnison Basin CCA would not jeopardize the continued existence of the Gunnison sage-grouse

or destroy or adversely modify its critical habitat if BLM, the Forest Service, and NPS implemented specific conservation measures and adhered to annual reporting requirements.

8.     But those conservation measures were not based on the best available science at the time the Biological Opinion was adopted and the Biological Opinion is deeply flawed: It fails to adequately account for the effects of grazing on the Gunnison sage-grouse and its critical habitat; relies on inadequate conservation measures and unsupported assumptions regarding their efficacy; fails to adequately analyze the cumulative impacts on the grouse; and fails to adequately consider the Gunnison Basin CCA's impacts on the grouse's recovery. Thus, Defendants' continued authorization of livestock grazing jeopardizes the Gunnison sage-grouse's continued existence, adversely modifies its critical habitat, and results in the unauthorized take of Gunnison sage-grouse in violation of the ESA.

9.     Further, BLM, the Forest Service, and NPS have not implemented the conservation measures or adhered to the Biological Opinion's reporting requirements and Gunnison sage-grouse populations have declined precipitously since the Biological Opinion's adoption. The Gunnison Basin population in particular has declined from approximately 3,149 birds in 2013 to only 1,667 in 2020. The spiral toward extinction of the Gunnison sage-grouse, the failure of the agencies to carry out required conservation measures and reporting requirements, and new information regarding the effects of the activities covered under the Gunnison Basin CCA on Gunnison sage-grouse each require Defendants to reinitiate ESA section 7 consultation on the Gunnison Basin CCA. Their failure to do so violates the ESA and its implementing regulations.

10.     Consequently, the Conservation Organizations respectfully request that this Court declare that Defendants' continued reliance on the Biological Opinion is arbitrary and capricious and violates the ESA and its implementing regulations, order Defendants to promptly reinitiate consultation, and enjoin BLM, the Forest Service, and NPS from authorizing livestock grazing in occupied Gunnison sage-grouse critical habitat on federal lands in the Gunnison Basin until an adequate and legally-valid consultation has been completed.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to the citizen suit provision of the ESA. 16 U.S.C. §§ 1540(g)(1), 1540(g)(2)(C). The Court also has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346, because this action involves the United States as a defendant and arises under the laws of the United States, including the ESA, 16 U.S.C. § 1531 *et seq.*, the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, and the Equal Access to Justice Act, 28 U.S.C. § 2214 *et seq*. The requested relief is proper under 16 U.S.C. § 1540(g)(1); 28 U.S.C. §§ 2201, 2202, 1361; and 5 U.S.C. §§ 704, 705, 706.

12.     The Conservation Groups gave notice to Defendants of Conservation Groups' intent to file suit under the ESA for the violations described in the notice and this complaint more than 60 days ago. 16 U.S.C. § 1540(g)(2)(C). The violations complained of in the notice have not been remedied. The Defendants' actions are final and ripe for review, and Conservation Organizations have standing to bring these claims.

13.     Venue is proper in this Court pursuant to 16 U.S.C. § 1540(g)(3)(A) and 28 U.S.C. § 1391(e). The Gunnison sage-grouse is located in this district, and FWS' regional office which issued the Biological Opinion is located here.

14.     The federal government has waived sovereign immunity in this action pursuant to

5 U.S.C. § 702 and 16 U.S.C. § 1540(g).

## PARTIES

15.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY ("Center") is a non-profit

organization that is dedicated to the preservation, protection, and restoration of biodiversity,

native species, and ecosystems. The Center was founded in 1989 and is based in Tucson,

Arizona, with offices throughout the country, including Colorado. The Center has more than

81,000 members, including many who reside in, explore, and enjoy the native species and

ecosystems of the Interior Mountain West and Colorado, including in the Gunnison Basin, where

the Gunnison sage-grouse is found. The Center's mission is to protect and conserve endangered

species and their habitats, including the Gunnison sage-grouse.

16.     The Center brings this action on behalf of itself and its members who derive

aesthetic, recreational, emotional, and spiritual benefits from the Gunnison sage-grouse and its

continued existence in its native habitat, including in the Gunnison Basin.

17.     The Center's members, including Pam Eaton, often visit occupied habitat in the

Gunnison Basin to view and enjoy Gunnison sage-grouse and their native habitat, including

specific areas impacted by the activities covered by the Gunnison Basin CCA.

18.     Ms. Eaton and other Center members derive aesthetic, recreational, inspirational,

emotional, and spiritual benefits from their visits to the Gunnison Basin in the hopes of viewing

Gunnison sage-grouse. Ms. Eaton intends to continue to visit occupied habitat in the Gunnison

Basin frequently and on an ongoing basis in the future, including this coming mating season in

spring of 2021. The areas of the Gunnison Basin that Ms. Eaton and other Center's members

intend to continue to use and enjoy include specific areas impacted by the activities covered by the Gunnison Basin CCA.

19.     The aesthetic, recreational, inspirational, emotional, and spiritual interests of Ms. Eaton and other Center members have been and will continue to be adversely affected and irreparably injured if Defendants' ongoing violations of the ESA and APA continue. These are actual, concrete injuries caused by Defendants' violations of the ESA and APA. The relief sought will redress the Center and its members' injuries.

20.     Plaintiff WESTERN WATERSHEDS PROJECT ("WWP") is a nonprofit organization with more than 12,000 members and supporters that is dedicated to protecting and restoring western watersheds and wildlife through education, public policy initiatives, and legal advocacy. WWP works to influence and improve public lands management throughout the West with a primary focus on the negative impacts of livestock grazing on 250 million acres of western public lands, including harm to ecological, biological, cultural, historic, archeological, scenic resources, wilderness values, roadless areas, Wilderness Study Areas, and designated Wilderness.

21.     WWP brings this action on behalf of itself and its members who derive aesthetic, recreational, and spiritual benefits from the Gunnison sage-grouse and its continued existence in its native habitat in the Gunnison Basin.

22.     WWP's staff and members, including Erik Molvar, often visit occupied habitat in the Gunnison Basin in efforts to view and enjoy Gunnison sage-grouse and their native habitat, including specific areas impacted by the activities covered by the Gunnison Basin CCA, such as areas where livestock grazing is authorized.

23.     Mr. Molvar and other WWP staff and members derive aesthetic, recreational, inspirational, scientific, and spiritual benefits from their visits to the Gunnison Basin in the hopes of viewing Gunnison sage-grouse. Mr. Molvar intends to continue to visit occupied habitat in the Gunnison Basin in search of Gunnison sage-grouse frequently and on an ongoing basis in the future, including in spring of 2021. The areas of the Gunnison Basin that Mr. Molvar and other WWP members intend to continue to use and enjoy include specific areas impacted by the activities covered by the Gunnison Basin CCA, like livestock grazing.

24.     The aesthetic, recreational, inspirational, scientific, and spiritual interests of Mr. Molvar and other WWP members have been and will continue to be adversely affected and irreparably injured if Defendants' ongoing violations of the ESA and APA continue. These are actual, concrete injuries caused by Defendants' violations of the ESA and APA. The relief sought will redress WWP's and its members' injuries.

25.     Defendant U.S. DEPARTMENT OF THE INTERIOR is an agency of the United States charged with administering the ESA for non-marine species including the Gunnison sage-grouse.

26.     Defendant DAVID BERNHARDT is the Secretary of Interior and is the federal official in whom the ESA vests final responsibility for making decisions required by and in accordance with the ESA. Secretary Bernhardt is sued in his official capacity.

27.     Defendant U.S. FISH AND WILDLIFE SERVICE is a federal agency within the Department of Interior charged with implementing and ensuring compliance with the ESA. The Secretary of the Interior has delegated administration of the ESA to the Service. 50 C.F.R. § 402.01(b).

28.     Defendant AURELIA SKIPWITH is the Director of the U.S. Fish and Wildlife Service. Director Skipwith is sued in her official capacity.

29.     Defendant UNITED STATES BUREAU OF LAND MANAGEMENT is an agency within the United States Department of the Interior and is the federal agency charged with managing more than 245 million acres of public land in the United States. In this capacity, BLM is responsible for implementing and complying with federal law, including the federal laws implicated by this action.

30.     Defendant WILLIAM PENDLEY is sued in the official capacity of exercising the authority of the Director of BLM.

31.     Defendant U.S. FOREST SERVICE is an agency within the U.S. Department of Agriculture. It and its officers are responsible for the lawful management of the National Forest System.

32.     Defendant VICKI CHRISTIANSEN is the Chief of the Forest Service. Chief Christiansen is sued in her official capacity.

33.     Defendant NATIONAL PARK SERVICE is an agency within the U.S. Department of the Interior, which is responsible for managing public lands under its authority in accordance with the federal laws implicated in this action.

34.     Defendant MARGARET EVERSON is sued in the official capacity of exercising the authority of the Director of the National Park Service.

## THE RELEVANT STATUTORY AND REGULATORY SCHEME

## I.     THE ENDANGERED SPECIES ACT

35.     Enacted in 1973, the ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). It provides a means to conserve endangered and threatened species and the ecosystems upon which they depend. 16 U.S.C. § 1531(b).

36.     To receive the full protections of the ESA, a species must first be listed by the Secretary of the Interior as "endangered" or "threatened." *Id.* at § 1533. The ESA defines an "endangered species" as "any species which is in danger of extinction throughout all or a significant portion of its range." *Id.* § 1532(6). A "threatened" species is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20).

37.     Recognizing the importance of timely habitat protections to the conservation and recovery of endangered species, the ESA requires the designation of critical habitat concurrently with listing a species. *Id.* § 1533(a)(3)(A)(i); *see also id.* § 1533(b)(6)(C). Habitat designated as critical habitat is essential to the species' survival and recovery. *Id.* § 1532 (3), (5)

38.     If a species is proposed for listing but is not yet listed, FWS may work with federal agencies, relevant states, and private parties to develop a "candidate conservation agreement" ("CCA"). These are formal agreements that seek to address the threats facing species that may be listed under the ESA.

39.     If a federal agency action is likely to jeopardize a species proposed for listing, or adversely modify its proposed critical habitat, the federal agency must confer informally with

FWS. 16 U.S.C. § 1536(a)(4); 50 C.F.R. § 402.10(a). During such a conference, FWS advises the federal agency "on ways to minimize or avoid adverse effects" to the species in a "conference opinion." 50 C.F.R. § 402.10(c).

40.     Once a species is listed and critical habitat is designated, section 7 of the ESA imposes a substantive obligation on federal agencies to "insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of" habitat that has been designated as critical for such species. *Id.* 16 U.S.C. § 1536(a)(2). The burden is placed on the federal agency to show that any action it authorizes or carries out will not adversely impact a listed species.

41.     Jeopardy results where an action reasonably would be "expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. "Destruction or adverse modification means a direct or indirect alteration that appreciably diminishes the value of critical habitat for both the survival and recovery of a listed species. Such alterations include, but are not limited to, alterations adversely modifying any of those physical or biological features that were the basis for determining the habitat to be critical." *Id.* (2014).[1]

42.     To fulfill the substantive mandates of section 7 of the ESA, federal agencies must consult with an expert agency—in the case of the Gunnison sage-grouse, FWS—before

---

[1] The regulatory definition of "destruction or adverse modification" in place at the time of the Biological Opinion's adoption in 2014 has since been amended. *See* Regulations for Interagency Cooperation, 84 Fed. Reg. 44,976 (Aug. 27, 2019).

undertaking actions with potential to affect listed species or their habitat. 16 U.S.C. § 1536; 50 C.F.R. § 402.14(a), (b). If the proposed action "may affect" listed species or their critical habitats, formal consultation is required. *Id.* § 402.14(a).

43.     To complete formal consultation, FWS must provide the action agency with a "biological opinion" explaining how the proposed action will affect the listed species or habitat. 16 U.S.C. § 1536(b); 50 C.F.R. § 402.14. In carrying out the consultation process, "each agency shall use the best scientific . . . data available." 16 U.S.C. § 1536(a)(2).

44.     If a species subject to the conference requirement is subsequently listed, "the Federal agency must review the action to determine whether formal consultation is required." 50 C.F.R. § 402.10(d). The federal agency may request that FWS adopt the agency's prior conference opinion as a formal biological opinion, but only if no significant new information is available and no changes are made to the federal agency action. *Id.* Such a conference opinion must meet all of the requirements of formal consultation. *Id.* § 402.10(d–e).

45.     If the biological opinion concludes that the proposed action is *not* likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat, but will result in the incidental take of the species, FWS must concurrently provide an "incidental take statement." *Id.* § 402.14(i). The incidental take statement must specify the impact (amount or extent) of incidental taking on the species, any "reasonable and prudent measures" that FWS considers necessary or appropriate to minimize such impact, and set forth the "terms and conditions," including but not limited to reporting requirements, that must be complied with by the agency. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i).

46.     The primary purpose of an incidental take statement and its measure of permissible take is to limit the amount of allowable take and provide a trigger for reinitiating consultation when the take limit has been exceeded. Compliance with the biological opinion and incidental take statement provides a safe harbor for federal agencies and others pursuant to the biological opinion from enforcement action under section 9's prohibition against take; 16 U.S.C. §§ 1536(o)(2); 1538(a); 50 C.F.R. § 17.31(a). Take that is not in compliance with a biological opinion or absent a valid take statement or take permit violates section 9.

47.     After the procedural requirements of consultation are complete, the ultimate duty to ensure that an activity does not jeopardize a listed species lies with the action agency. An action agency's reliance on an inadequate, incomplete, or flawed biological opinion to satisfy its ESA Section 7 duty is arbitrary and capricious and violates the ESA.

48.     Federal agencies are also required to report back to FWS on the action's progress and its impact on listed species in order to monitor the impacts of incidental take. 50 C.F.R. § 402.14(i)(3). In certain circumstances, the agencies must "reinitiate" consultation.

49.     Action agencies and FWS have a duty to reinitiate consultation if "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered;" "the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion or written concurrence;" or "a new species is listed or critical habitat designated that may be affected by the identified action." *Id.* § 402.16(a)(2–4). In addition, consultation must be reinitiated "[i]f during the course of the action the amount or extent of incidental taking … is exceeded." *Id.* §§ 402.14(i)(4); 402.16(a)(1).

50.     Once consultation is reinitiated, section 7(d) of the ESA provides that the action agency "shall not make any irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable or prudent measures which would not violate subsection (a)(2) of [section 7]." 16 U.S.C. § 1536(d).

## II.     THE ADMINISTRATIVE PROCEDURE ACT

51.     Pursuant to the APA, any person who has suffered legal wrong because of agency action, or who is adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. 5 U.S.C. § 702.

52.     Under 5 U.S.C. § 706, "the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." The APA also requires a reviewing court to:

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [or]
> . . .
> (D) without observance of procedure required by law….

*Id.* § 706(1)-(2).

## FACTUAL ALLEGATIONS

## I.     THE GUNNISON SAGE-GROUSE

53.     The Gunnison sage-grouse, famous for the males' spiky barred tailfeathers and distinctive mating dance performed on mating grounds called leks, depends on undisturbed sagebrush interspersed with native grasses and forbs to survive.

54.     Once widespread in New Mexico, Arizona, Utah, and Colorado, the Gunnison sage-grouse has suffered serious population declines and range constrictions due to threats including habitat modification from livestock grazing. According to the best available science, 5,000 sage-grouse are required to achieve a minimum viable population able to persist over the long term, but the Gunnison sage-grouse's numbers have remained well below this threshold since accurate population counts began. By the early 2000s, the species had been identified as a high priority species for ESA listing—although it took nearly a decade and a half for listing to occur.

55.     By the time the Gunnison sage-grouse was listed as a threatened species under the ESA in 2014, it was reduced to seven small populations in Colorado and eastern Utah. The largest of these inhabits the Gunnison Basin in Colorado. The survival and recovery of the Gunnison Basin population is essential to the survival and recovery of the species. None of the other so-called "satellite" populations are resilient enough to ensure the species' survival, let alone recovery.

56.     The second-largest population at San Miguel is documented to be steeply declining. One population, at Poncha Pass, has been trending towards extirpation for years, has no critical habitat designated, and is sustained by transplants from the Gunnison Basin population. Another, at Cerro Summit/Cimarron/Sims Mesa, may actually be extirpated, with zero males counted on leks in 2020. An additional subpopulation at Dove Creek also appears to have been extirpated, with zero males counted in 2019 and 2020.

57.     The Gunnison sage-grouse is severely threatened by livestock grazing and residential development, which are contributing to habitat declines in all population areas.

Nevertheless, more than 75 percent of Gunnison sage-grouse occupied critical habitat in the Gunnison Basin is grazed by livestock.

## II.    THE GUNNISON BASIN CCA

58.    In 2013, anticipating potential ESA listing for the Gunnison sage-grouse, BLM, the Forest Service, and NPS—which together manage and authorize grazing on roughly two-thirds of the bird's occupied habitat in the Gunnison Basin —signed the Gunnison Basin CCA, in which they agreed to implement specific conservation actions intended to limit impacts on the Gunnison Basin population for three categories of land uses: land development, recreation, and livestock grazing.

59.    The Gunnison Basin CCA "serves as a project screen and requires the implementation of conservation measures associated with…livestock grazing" and other common land use authorizations. *Colorado by & Through Colorado Dep't of Nat. Res. v. United States Fish & Wildlife Serv.*, 362 F. Supp. 3d 951, 975 (D. Colo. 2018).

60.    As part of the Gunnison Basin CCA's development, BLM, the Forest Service, and NPS prepared a biological assessment purportedly assessing the effects of covered activities on the grouse.

61.    BLM, the Forest Service, and NPS then submitted the biological assessment to FWS to determine whether the authorized actions may adversely affect the Gunnison sage-grouse and its proposed critical habitat.

62.    FWS concluded in an initial "conference opinion" that the proposed action was not likely to jeopardize the continued existence of Gunnison sage-grouse or adversely modify its critical habitat if conservation measures were implemented to mitigate their impact on the

species, but that several activities (including livestock grazing) were likely to adversely affect the species if those conservation measures were not implemented.

### III.   THE BIOLOGICAL OPINION

63.   FWS subsequently listed the Gunnison sage-grouse as a threatened species in 2014 and designated 1.4 million acres as the bird's critical habitat, including 500,909 acres of occupied critical habitat in the Gunnison Basin.

64.   Shortly after the listing decision, BLM requested that FWS adopt the conference opinion as its biological opinion and, on December 8, 2014, FWS complied, resulting in the Biological Opinion at issue in this lawsuit.

65.   The Biological Opinion and its accompanying reasonable and prudent measures, terms and conditions, and Incidental Take Statement ("ITS") are effective for 20 years and apply within Gunnison sage-grouse occupied critical habitat in the Gunnison Basin.

66.   The Biological Opinion found that some of the activities authorized by agencies under the Gunnison Basin CCA, including grazing, were likely to adversely affect the Gunnison sage-grouse.

67.   Nevertheless, the Biological Opinion concluded that grazing would not jeopardize the continued existence of the species or adversely modify its critical habitat because the Biological Opinion assumed, without setting forth any scientific support, that implementing the Gunnison Basin CCA's conservation measures would dramatically reduce impacts to Gunnison sage-grouse.

68.   The Biological Opinion's reasonable and prudent measures, terms and conditions, and conservation measures, amongst other obligations, require BLM, the Forest Service, and

NPS to conduct short- and long-term habitat monitoring. At a minimum, they must determine whether grazing allotments are meeting arbitrary guidelines for herbaceous heights—3.9 – 5.9 inches—adopted in the 2005 Gunnison Sage-grouse Rangewide Conservation Plan ("2005 RCP"). These same habitat guidelines are to be incorporated into grazing permits.

69.     If herbaceous heights are being met, BLM, the Forest Service, and NPS must collect herbaceous heights and photo points once every three years; if not, they must conduct "trigger monitoring" (which includes monitoring how much livestock graze an allotment, i.e., "utilization") and collect herbaceous heights and photo points annually immediately following livestock use. If the guidelines are not met, the Biological Opinion contemplated that the agencies would reduce stocking levels or make other long-term adjustments to grazing permits.

70.     Additionally, the Biological Opinion obligated the BLM, the Forest Service, and NPS to: immediately report any known injury or mortality of Gunnison sage-grouse, or losses of nests or eggs, resulting from implementation of the Gunnison Basin CCA; track incidental take (defined as future use disturbance) by land use type with respect to the 20-year disturbance limits; and provide such information in annual reports.

71.     The Biological Opinion presumed that annual incidental take from grazing would not change because the amount of take is estimated based on the acreage of lands grazed annually, and the Biological Opinion assumed this would remain static over the Gunnison Basin CCA's 20-year lifespan.

72.     When analyzing the effects of grazing, the Biological Opinion relied on inaccurate assumptions contrary to the best available science at the time about the effects of livestock grazing authorized in the Gunnison Basin on Gunnison sage-grouse.

73.     For instance, the Biological Opinion underestimated the effects of livestock grazing on the Gunnison sage-grouse because it assumed, without setting forth any scientific support, that take would only occur on a quarter of all lands impacted by livestock grazing and that conservation measures would further reduce take by 95 percent.

74.     The best available science at the time, however, indicated "[o]ne of 6 encounters by cows resulted in a partial nest depredation," and that far more Gunnison sage-grouse may be harmed by grazing than the 35 total grouse FWS predicted would be affected over the 20-year life of the Gunnison Basin CCA.

75.     The "conservation measures" the Biological Opinion relied upon to avoid jeopardy and adverse modification were also inadequate and contrary to the best available science at the time. For instance, the Biological Opinion's 3.9 to 5.9-inch herbaceous height standard has never been consistent with the best available science, which indicates that sage-grouse require at least a 7-inch grass height. The Biological Opinion's conservation measures further allow for "moderate," 50 percent utilization of vegetation by livestock, when the best available science, both at the time of the Biological Opinion's issuance and currently, recommends no more than light utilization of no more than 20 to 30 percent if sage-grouse conservation is an objective.

76.     The Biological Opinion thus failed to adequately assess and address the adverse impacts grazing has on Gunnison sage-grouse and its occupied critical habitat in the Gunnison Basin.

77.     The Biological Opinion additionally failed to adequately assess the cumulative impacts of the actions covered under the Gunnison Basin CCA along with other actions affecting

the Gunnison sage-grouse. It concluded that "residential development, agricultural production, State and county road maintenance activities, vehicle traffic on area roads, livestock grazing, hunting, and human infrastructure … [e]ach [have] the potential to affect Gunnison sage-grouse and its habitat." But it contains no analysis about how these activities together will affect the species. Simply listing activities with no supporting analysis does not satisfy the requirements of the ESA.

78.     Finally, the Biological Opinion failed to analyze the Gunnison Basin CCA's impact on the Gunnison sage-grouse's recovery. Rather, it concluded (again without support) that the implementation of proposed conservation measures would advance recovery, even while it determined that grazing was likely to adversely impact Gunnison sage-grouse. But because by the FWS' own determination, grazing, even with the CCA conservation measures, will adversely affect Gunnison sage-grouse, the Gunnison Basin CCA will not bring the species "to the point at which the measures provided pursuant to this Act are no longer necessary"—i.e., recovery. 16 U.S.C. § 1532(3).

79.     By relying on baseless assumptions and inadequate conservation measures without considering cumulative impacts to the species or its chances of recovery from actions authorized in combination with other reasonably foreseeable actions, the Biological Opinion violates the ESA, is contrary to the best available science, and is arbitrary and capricious.

## IV.     NEW INFORMATION SINCE THE GUNNISON BASIN CCA'S ADOPTION AND THE ISSUANCE OF THE BIOLOGICAL OPINION

80.     The adoption of the Gunnison Basin CCA has not led to an improvement in the status of the Gunnison sage-grouse or its habitat. Indeed, new information shows that the species

has continued to decline in the Gunnison Basin since the CCA was adopted and that grazing threatens Gunnison sage-grouse to an extent FWS never considered.

**A.  The Gunnison Sage-Grouse's Decline in the Gunnison Basin.**

81.     When the Gunnison Basin CCA was developed in 2013, lek surveys conducted by Colorado Parks and Wildlife ("CPW") detected 848 males in the Gunnison Basin. In 2019, only 363 males—less than half the 2019 number—were counted. Although populations rebounded slightly in 2020 with 449 males detected, they remain well below 2013 numbers.

82.     Based on high male counts compiled annually by CPW and the best available science, the estimated Gunnison sage-grouse population for the Gunnison Basin has declined from 3,149 in 2013 to only 1,667 in 2020—over a 40 percent decline in just six years.

83.     The 3-year running average for the Gunnison Basin population of grouse has also declined in the past three years: 2,869 in 2018; 2,167 in 2019; and 1,788 in 2020. The three-year average high male count for Gunnison sage-grouse in the Gunnison Basin in 2020 is the lowest it has been since lek count methods were standardized in 1998.

84.     The Gunnison Basin CCA itself anticipated such a tipping point, stating that if "during the lifetime of the CCA, … the 3-year moving average of the Gunnison Basin population declines toward a population estimate of 2000 birds a) over two consecutive years, or b) over a 5-year period, CCA signatories will revisit the conservation measures and management actions outlined in the CCA." In fact, the Gunnison Basin CCA contemplated reinitiating consultation even before the explicit thresholds were met so that the Gunnison sage-grouse would not be beyond the point of saving before efforts could be taken.

85.     The 3-year moving average of the Gunnison Basin has now declined toward a population estimate of 2,000 birds over two consecutive years. Indeed, the Forest Service has recognized that "population counts [have] dropped below the three-year average population threshold," and BLM has recognized that "the 3-year running average is down."

**B. BLM's, The Forest Service's, And NPS' Failure to Implement the Biological Opinion's Conservation Measures, Terms and Conditions, And Reporting Requirements.**

86.     Further, on information and belief, BLM, the Forest Service, and NPS have failed to adhere to the Biological Opinion's reasonable and prudent measures, terms and conditions, and annual reporting requirements, have failed to monitor and report any known injury or mortality of Gunnison sage-grouse or losses of nests or eggs, and have renewed livestock grazing permits within occupied habitat without incorporating the Gunnison Basin CCA's required terms and conditions or without first determining whether Gunnison sage-grouse habitat requirements are being satisfied. Even where terms and conditions have been incorporated, grazing has continued without substantial changes despite failures to meet Gunnison sage-grouse habitat requirements.

87.     The Biological Opinion required BLM, the Forest Service, and NPS to track incidental take by land type with respect to the 20-year disturbance limits and provide such information in annual reports. The 20-year disturbance limits cannot be exceeded without exceeding the ITS.

88.     The Biological Opinion also required BLM, the Forest Service, and NPS to immediately report any known injury or mortality of Gunnison sage-grouse, or losses of nests or eggs.

89.     BLM, the Forest Service, and NPS are additionally required to annually report the number of grazing permits renewed, along with an assessment of habitat conditions for each renewed permit, and the results of short-term monitoring tracking herbaceous height data, photo point data, any additional environmental data, and whether permits modified to incorporate sage-grouse habitat guidelines and standards are meeting such standards.

90.     BLM, the Forest Service, and NPS have failed to adhere to these monitoring and reporting requirements. Records received through Freedom of Information Act requests and directly from the agencies show not all allotments in Gunnison sage-grouse occupied critical habitat have been monitored and that few annual reports have been completed. When they have been completed, they do not contain all of the required content or have not been completed on an annual basis. Grazing permits have also been renewed without imposing even the inadequate 2005 RCP habitat requirements.

91.     Where grazing monitoring has occurred, grass and forb height and cover standards for Gunnison sage-grouse are not always being met, and most sites are not meeting the minimum 7-inch grass height the Gunnison sage-grouse requires. But rather than altering grazing to respond to these problems, the agencies have ascribed failures to site potential, drought, or other factors.

92.     FWS has also subsequently admitted that monitoring direct take of Gunnison sage-grouse from livestock grazing is impossible to accurately track. Thus, one of the Biological Opinion's reporting requirements, intended to serve as an important trigger for reinitiation of consultation, is rendered meaningless.

**C.  New Scientific Information Reveals Threats to the Gunnison Sage-Grouse from Grazing.**

93.     New scientific information also undermines the Biological Opinion's analysis of the effects of livestock grazing.

94.     For example, new scientific information demonstrates that the Gunnison Basin CCA's population model significantly overestimates the total number of birds. Specifically, the Gunnison Basin CCA relies on a population model that uses the highest number of males counted at a lek, referred to as a "high male count," to estimate the total population of Gunnison sage-grouse. However, it assumes that high male counts represent only 53 percent of the male population because some males go uncounted due to visibility, human error, or some other reason—in other words, that the male population is nearly twice the highest number of male birds actually counted. The current best available science, however, shows that high male counts account for between 77 percent and 93 percent of the male population. As a result, the agencies' population estimates are greatly inflated and likely do not reflect the current on-the-ground condition of the species.

95.     Further, the best available science now indicates that the invasive weed cheatgrass is spread by livestock and that cheatgrass harms Gunnison sage-grouse and adversely modifies their critical habitat in a manner not considered in the Biological Opinion by reducing the presence of sagebrush, perennial grasses, and forbs, and by increasing the frequency and intensity of fire. FWS acknowledged as much in its 2019 Species Status Assessment where it found its prior analysis of cheatgrass was "outdated or in need of further review."

96.     The decline of the Gunnison sage-grouse in the Gunnison Basin, the failures of the agencies to implement the Biological Opinion's terms and conditions, and new information

concerning impacts to the Gunnison sage-grouse from the activities authorized by the Gunnison

Basin CCA that the Biological Opinion did not consider invoke the agencies' duty to reinitiate

consultation. The agencies' failure to reinitiate consultation violates the ESA and the APA.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**(BLM's, the Forest Service's, NPS', and FWS' Failure to Reinitiate Formal Consultation on the Biological Opinion Violates the ESA and is Arbitrary and Capricious or Otherwise Not in Accordance with Law)**

97.     The Conservation Organizations reallege and incorporate by reference the

preceding paragraphs.

98.     BLM, the Forest Service, and NPS consulted with FWS regarding the Gunnison

Basin CCA and retain discretionary control over the Gunnison Basin CCA and the activities

authorized by it. An agency must reinitiate consultation whenever new information reveals

effects of the action that may affect the species or its critical habitat in a manner or to an extent

not previously considered, or if the action is modified in a manner that causes an effect to the

species or its critical habitat in a way not considered in the consultation. 50 C.F.R. § 402.16.

99.     New information reveals that the effects of the activities authorized by the

Gunnison Basin CCA, including livestock grazing within occupied critical habitat in the

Gunnison Basin, affect the Gunnison sage-grouse and its critical habitat in a manner and to an

extent not previously considered. Such new information includes:

- Drastic population declines, including within the Gunnison Basin, since the Gunnison Basin CCA's adoption that place the species' future in doubt;

- Evidence that the population model adopted by the Gunnison Basin CCA overestimates the total population of Gunnison sage-grouse; and

- Impacts from invasive cheatgrass not previously considered.

100.     BLM's, the Forest Service's, and NPS' failure to adhere to the Biological Opinion's annual reporting requirements, renewal of livestock grazing permits within occupied habitat without incorporating the Gunnison Basin CCA's required terms and conditions, and failure to modify grazing permits where Gunnison sage-grouse habitat requirements were not met also modified the implementation of the Gunnison Basin CCA in a manner that causes an effect on Gunnison sage-grouse and its critical habitat in a way not considered in the Biological Opinion.

101.     By failing to reinitiate consultation over the Gunnison Basin CCA, BLM, the Forest Service, and NPS have violated and continue to violate the ESA and its implementing regulations, and their failure to do so is not in accordance with the law. 50 C.F.R. § 402.16. The FWS has violated the ESA and the APA by failing to request that BLM, the Forest Service, and NPS reinitiate consultation. 5 U.S.C. § 706(2). The agencies' failure to promptly reinitiate and/or request reinitiation of consultation as required by the ESA has caused or threatens serious prejudice and injury to Conservation Organizations' rights and interests.

## SECOND CLAIM FOR RELIEF

**(BLM's, the Forest Service's, and NPS' Continued Authorization of Activities Under the Gunnison Basin CCA and Their Continued Reliance on the Biological Opinion Jeopardizes the Gunnison Sage-grouse and Adversely Modifies Its Critical Habitat)**

102.     The Conservation Organizations reallege and incorporate by reference the preceding paragraphs.

103.     The BLM, the Forest Service, and NPS continue to authorize activities, including grazing, under the Gunnison Basin CCA, despite new information revealing that those actions

affect Gunnison sage-grouse and its critical habitat in a manner and to an extent not previously considered.

104.    The BLM, the Forest Service, and NPS continue to authorize activities, including grazing, under the Gunnison Basin CCA, despite their failure to adhere to the Biological Opinion's and ITS' annual reporting requirements and to implement the required conservation measures.

105.    By failing to comply with ITS' terms and conditions, BLM, the Forest Service, and NPS are liable for take caused by the Gunnison Basin CCA. 16 U.S.C. §§ 1536(o)(2); 1538(a); 50 C.F.R. § 17.31(a)

106.    These modifications to the implementation of the Gunnison Basin CCA in a manner that affects Gunnison sage-grouse and its critical habitat in ways not considered in the Biological Opinion also jeopardizes the Gunnison sage-grouse and adversely modifies its habitat, in violation of the ESA. 16 U.S.C. § 1536(a)(2). The agencies' authorization of activities that affect the Gunnison sage-grouse in ways not considered has caused or threatens serious prejudice and injuries to Conservation Organizations' rights and interests.

## THIRD CLAIM FOR RELIEF

**(FWS' Issuance of and BLM's, the Forest Service's, and NPS' Reliance upon the Biological Opinion is Contrary to the ESA and Arbitrary and Capricious)**

107.    The Conservation Organizations reallege and incorporate by reference the preceding paragraphs.

108.    FWS' Biological Opinion is arbitrary and capricious and violates the ESA, 16 U.S.C. § 1536, and the APA, 5 U.S.C. § 706, for reasons including but not limited to:

- Failing to adequately account for the effects of grazing on the Gunnison sage-grouse and its critical habitat;

- Relying on inadequate conservation measures and unsupported assumptions regarding their efficacy to write off these impacts;

- Failing to adequately analyze the cumulative effects impacting the Gunnison sage-grouse and adversely modifying its occupied critical habitat within the Gunnison Basin and throughout its range;

- Failing to meaningfully consider how the Gunnison Basin CCA's implementation will affect the Gunnison sage-grouse's recovery;

- Failing to rely on the best available science at the time the Biological Opinion was issued regarding Gunnison sage-grouse conservation.

109.    BLM, the Forest Service, and NPS have an independent, substantive duty under section 7 of the ESA to ensure that their actions and actions they authorize are not likely to jeopardize the Gunnison sage-grouse or destroy or adversely modify its critical habitat. 16 U.S.C. § 1536(a)(2).

110.    FWS' Biological Opinion violates the ESA and APA and is unlawful; therefore, BLM's, the Forest Service's, and NPS' reliance on the Biological Opinion to fulfill their section 7 procedural and substantive duties also violates the ESA. The agencies' failure to ensure their actions and actions they authorize do not jeopardize the Gunnison sage-grouse has caused or threatens serious prejudice and injury to Conservation Organizations' rights and interests.

## PRAYER FOR RELIEF

A.    Declare that BLM, the Forest Service, NPS, and FWS are violating 50 C.F.R. § 402.16 by failing to reinitiate consultation over the Gunnison Basin CCA;

B.    Declare that the Biological Opinion is arbitrary and capricious, in violation of the APA and ESA;

C.      Order BLM, the Forest Service, and NPS to immediately reinitiate consultation with FWS over the Gunnison Basin CCA;

D.      Declare that BLM's, the Forest Service's, and NPS' continued authorization of activities covered by the Gunnison Basin CCA, including livestock grazing, and their continued reliance on the Biological Opinion violates their duties under section 7(a)(2) and the ESA's implementing regulations to ensure that actions they authorize or carry out do not jeopardize the Gunnison sage-grouse, or destroy or adversely modify its critical habitat;

E.      Enjoin BLM, the Forest Service, and NPS from authorizing livestock grazing on occupied critical habitat on federal lands in the Gunnison Basin until an adequate and legally-valid consultation has been completed;

F.      Award the Conservation Groups their reasonable costs, litigation expenses, and attorneys' fees associated with this litigation pursuant to the ESA, 16 U.S.C. § 1540(g) and the Equal Access to Justice Act, 28 U.S.C. § 2412 *et seq.*; and

G.      Grant such further relief as the Court deems just and proper.


Dated: December 7, 2020                    Respectfully submitted,

                                           /s/ Ryan Adair Shannon
                                           Ryan Adair Shannon
                                           Center for Biological Diversity
                                           P.O. Box 11374
                                           Portland, OR 97211
                                           (503) 283-5474
                                           Fax: (503) 283-5528
                                           rshannon@biologicaldiversity.org

                                           *Counsel for the Center for Biological Diversity*

/s/ Talasi B. Brooks
Talasi B. Brooks
Western Watersheds Project
P.O. Box 2863
Boise, ID 83714
(208) 336-9077
tbrooks@westernwatersheds.org

*Counsel for Western Watersheds Project*