# Ex. A

# Plaintiffs' 60-day Notice of Intent to Sue for Violations of the Endangered Species Act and Accompanying Declaration




WWP Idaho
PO Box 2863
Boise, ID 83701
(208) 336-9077
tbrooks@westernwatersheds.org

*Working to protect and restore
Western Watersheds and Wildlife*

September 23, 2020

*Via Electronic and Certified Mail*

David Bernhardt, Secretary of the Interior
U.S. Department of the Interior
1849 C Street, N.W.
Washington, D.C. 20240
exsec@ios.doi.gov

Aurelia Skipwith, Director
U.S. Fish and Wildlife Service
1849 C Street, N.W.
Washington, D.C. 20240
Aurelia_Skipwith@fws.gov

William Pendley, Acting Bureau of Land Management Director
National Operations Center
Denver Federal Center, Bldg. 50
P.O. Box 25047
Denver, CO 80225-0047
wpendley@blm.gov

Vicki Christiansen, Forest Service Chief
USDA Forest Service
Attn: Vicki Christiansen
1400 Independence Ave., SW
Washington, D.C. 20250
vcchristiansen@fs.fed.us

Margaret Everson, Exercising the Delegated Authority of the Director, National Park Service
National Park Service
1849 C Street NW
Washington, DC 20240

**RE: 60-day Notice of Intent to Sue for Violations of the Endangered Species Act Related to Reliance on the Gunnison Candidate Conservation Agreement Biological Opinion for Livestock Grazing Authorizations in the Gunnison Basin.**

Dear Secretary Bernhardt, U.S. Fish and Wildlife Service Director Skipwith, Acting Bureau of Land Management Director Pendley, Forest Service Chief Christiansen, and Acting National Park Service Director Everson:

The Center for Biological Diversity (Center) and Western Watersheds Project (WWP) provide notice that the Bureau of Land Management (BLM), U.S. Forest Service (Forest Service), National Park Service (NPS) (collectively the Action Agencies), and U.S. Fish and Wildlife Service (FWS) have violated sections 7 and 9 of the ESA by failing to ensure that the adoption and continuing implementation of the Gunnison Basin Candidate Conservation Agreement (Gunnison Basin CCA) and its attendant Biological Opinion (BiOp) authorizing development, recreation, and livestock grazing within occupied Gunnison sage-grouse (*Centrocercus minimus*) critical habitat in the Gunnison Basin do not jeopardize the continued existence of the bird, adversely modify its critical habitat, or result in unauthorized take.[1]

The Gunnison Basin CCA was developed in 2013 following FWS's proposal to list the Gunnison sage-grouse as endangered and designate critical habitat. It was intended to provide coverage to the Action Agencies for incidental take of Gunnison sage-grouse in the event that the species was listed, as well as specify needed conservation measures and monitoring. After deciding to list the Gunnison sage-grouse under the ESA and designate critical habitat for it, FWS adopted its prior analysis of the Gunnison Basin CCA's effects in the BiOp.[2]

Since FWS adopted the BiOp, Gunnison sage-grouse numbers have declined dramatically and the species now stands on the brink of extinction. In the face of this decline, the Action Agencies' continued authorization of livestock grazing, coupled with their failure to adhere to the BiOp's annual reporting requirements, jeopardizes the Gunnison sage-grouse's continued existence, adversely modifies its critical habitat, results in the unlawful take of Gunnison sage-grouse, and violates the ESA. The Action Agencies' and FWS's failure to reinitiate consultation in light of the species' decline and the best available science, their failure to implement the BiOp's conservation measures, and the likely exceedance of the BiOp' incidental take statement (ITS), similarly violates the ESA. Even if the situation were not so dire, the BiOp was and remains fundamentally flawed.

The Center is a non-profit conservation organization dedicated to the protection of native species and their habitats through science, policy, and environmental law. The Center has more than 81,000 members across the world, including many in Gunnison County, Colorado. Some Center members enjoy recreating in and deriving aesthetic benefit from the habitat of the Gunnison sage-grouse within the Gunnison Basin.

WWP is a nonprofit organization with more than 12,000 members and supporters that is dedicated to protecting and restoring western watersheds and wildlife through education, public policy initiatives, and legal advocacy. WWP works to influence and improve public lands management throughout the West with a primary focus on the negative impacts of livestock

---

[1] *See* 16 U.S.C. § 1540(g).
[2] Adoption of the Gunnison Basin Candidate Conservation Agreement Conference Opinion as the Final Biological Opinion (Dec. 8, 2014).

grazing on 250 million acres of western public lands, including harm to ecological, biological, cultural, historic, archeological, scenic resources, wilderness values, roadless areas, Wilderness Study Areas and designated Wilderness.

Unless the Action Agencies and FWS, within 60 days of receipt of this notice, ameliorate their ongoing violations of sections 7 and 9 by withdrawing the BiOp, reinitiating consultation, and halting activities previously authorized under the BiOp until consultation has been completed, the Center and WWP intend to challenge the agencies' unlawful conduct in court.

## I.     THE ENDANGERED SPECIES ACT

Enacted in 1973, the ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation."[3] The ESA provides a means to conserve endangered and threatened species and the ecosystems upon which they depend.[4] To receive the full protections of the ESA, a species must first be listed by the Secretary of the Interior as "endangered" or "threatened."[5] The ESA defines an "endangered species" as "any species which is in danger of extinction throughout all or a significant portion of its range."[6] A "threatened" species is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."[7]

Recognizing the importance of timely habitat protections to the conservation and recovery of endangered species, the ESA requires the designation of critical habitat concurrently with listing a species.[8] Critical habitat means "the specific areas within the geographical area occupied by the species . . . on which are found those physical or biological features (I) *essential* to the conservation of the species and (II) which may require special management considerations or protection;" and unoccupied areas "*essential* for the conservation of the species."[9] "Conservation" is defined as all methods that can be employed to "bring any endangered species or threatened species to the point at which the measures provided pursuant to this [Act] are no longer necessary."[10] As such, "the purpose of establishing 'critical habitat' is for the government to carve out territory that is not only necessary for the species' survival but also essential for the species' recovery."[11]

Once a species is listed and critical habitat is designated, section 7 of the ESA imposes a substantive obligation on federal agencies to "insure that any action authorized, funded, or

---

[3] *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978).
[4] 16 U.S.C. § 1531(b).
[5] *See id.* § 1533.
[6] *Id.* § 1532(6).
[7] *Id.* § 1532(20).
[8] *Id.* § 1533(a)(3)(A)(i); *see also id.* § 1533(b)(6)(C).
[9] *Id.* § 1532(5) (emphasis added).
[10] *Id.* § 1532(3).
[11] *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1070 (9th Cir. 2004).

carried out by such agency ... is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of" habitat that has been designated as critical for such species.[12] Thus, "[i]t is the action agency's burden to show the absence of likely adverse effects on listed species."[13] Jeopardy results where an action reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by impacting the reproduction, numbers, or distribution of that species.[14] "Destruction or adverse modification means a direct or indirect alteration that appreciably diminishes the value of critical habitat for both the survival and recovery of a listed species. Such alterations include, but are not limited to, alterations adversely modifying any of those physical or biological features that were the basis for determining the habitat to be critical."[15] The ESA also prohibits "take" of a species—which includes harassing, harming, wounding, killing, trapping, capturing or collecting a listed species.[16] "Take" includes direct as well as indirect harm and need not be purposeful.[17]

To fulfill the substantive mandates of section 7 of the ESA, federal agencies must consult with an expert agency—here, FWS—before undertaking actions with potential to affect listed species or their habitat.[18] If the proposed action "may affect" listed species or their critical habitats, formal consultation is required.[19] Once consultation is initiated, "the Federal agency and the permit or license applicant [cannot] make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures."[20] To complete formal consultation, FWS must provide the action agency with a "biological opinion" explaining how the proposed action will affect the listed species or habitat.[21] In carrying out the consultation process, "each agency shall use the best scientific . . . data available."[22]

If the biological opinion concludes that the proposed action (or implementation of any reasonable and prudent alternatives) is *not* likely to jeopardize the continued existence of a listed species, or result in the destruction or adverse modification of critical habitat, but will result in the incidental take of the species, FWS must concurrently provide an "incidental take statement."[23] The incidental take statement must specify the impact (amount or extent) of incidental taking on the species, any "reasonable and prudent measures" that FWS considers

---

[12] *See* 16 U.S.C. § 1536(a)(2).

[13] *Forest Guardians v. Johanns*, 450 F.3d 455, 463 (9th Cir. 2006) (citing 16 U.S.C. § 1536(a)(2)).

[14] 50 C.F.R. § 402.02.

[15] *Id.* (2014).

[16] 16 U.S.C. §§ 1538(a)(1), 1532(19).

[17] *See* 50 C.F.R. § 17.3 (definitions of "harass" and "harm"); *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.,* 515 U.S. 687, 704 (1995).

[18] 50 C.F.R. § 402.14(a), (b).

[19] *Id.* § 402.14(a).

[20] 16 U.S.C. § 1536(d).

[21] *Id.* § 1536(b); 50 C.F.R. § 402.14.

[22] 16 U.S.C. § 1536(a)(2).

[23] 50 C.F.R. § 402.14(i).

necessary or appropriate to minimize such impact, and set forth the "terms and conditions," including but not limited to reporting requirements, that must be complied with by the agency to implement those measures.[24]

After the procedural requirements of consultation are complete, however, the ultimate duty to ensure that an activity does not jeopardize a listed species lies with the action agency. An action agency's reliance on an inadequate, incomplete, or flawed biological opinion to satisfy its ESA Section 7 duty is arbitrary and capricious and violates the ESA.[25]

Federal agencies are also required to report back to FWS on the action's progress and its impact on listed species in order to monitor the impacts of incidental take.[26] "If during the course of the action the amount or extent of incidental taking … is exceeded, the Federal agency must reinitiate consultation immediately."[27] Consultation must also be reinitiated if: "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered;" "the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion or written concurrence;" or "a new species is listed or critical habitat designated that may be affected by the identified action."[28] "[A] primary purpose of the [incidental take statement] and its measure of permissible take is to provide a trigger for reinitiating consultation under Section 7(a)(2) of the ESA."[29]

If a species is proposed for listing but is not yet listed, or if FWS has found that listing is warranted but precluded by other higher priority listing activities, FWS may work with federal agencies, relevant states, and private parties to develop a candidate conservation agreement. These are formal agreements that seek to address the threats facing species that may be listed under the ESA.

Additionally, if a federal agency action is likely to jeopardize a species proposed for listing, or adversely modify its proposed critical habitat, the federal agency must confer with FWS.[30] During such a conference, FWS advises the federal agency "on ways to minimize or avoid adverse effects."[31] If the species is subsequently listed, "the Federal agency must review the action to determine whether formal consultation is required."[32] The federal agency may then request a formal conference opinion adopting the agency's prior conference with FWS as a formal biological opinion if no significant new information is available and no changes are

---

[24] 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i).

[25] *See Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 532 (9th Cir. 2010).

[26] 50 C.F.R. § 402.14(i)(3).

[27] *Id.* §§ 402.14(i)(4); 402.16(a)(1).

[28] *Id.* § 402.16(a)(2-4).

[29] *Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 913 (9th Cir. 2012).

[30] 16 U.S.C. § 1536(a)(4); 50 C.F.R. § 402.10(a).

[31] 50 C.F.R. § 402.10(c).

[32] *Id.* at § 402.10(d).

made to the federal agency action.[33] Such a conference opinion must meet all of the requirements of formal consultation.[34]

## II.   FACTUAL BACKGROUND

Once widespread in New Mexico, Arizona, Utah, and Colorado, the Gunnison sage-grouse suffered such serious population declines and range constrictions that by the time it was listed in 2014, it was limited to seven small populations in Colorado and eastern Utah. The largest of these inhabits the Gunnison Basin in Colorado.[35] The Gunnison sage-grouse depends on undisturbed sagebrush interspersed with native grasses and forbs and remains severely threatened by livestock grazing and development, which are contributing to habitat declines in all population areas.[36] One population, at Dove Creek, appears to be extirpated, with zero males counted in the 2019 and 2020 lek counts.[37] Another population (Cerro Summit/Cimarron/Sims Mesa) may also be extirpated, with zero males counted in 2020.[38]

Anticipating potential ESA listing for the Gunnison sage-grouse, the Action Agencies, which together manage roughly two-thirds of the bird's occupied habitat in the Gunnison Basin, signed the Gunnison Basin CCA, in which they agreed to implement specific conservation actions intended to limit impacts on the Gunnison Basin population for three categories of land uses: land development, recreation, and livestock grazing.[39] The Gunnison Basin CCA "serves as a project screen and requires the implementation of conservation measures associated with…livestock grazing" and other common land use authorizations.[40]

As part of the CCA process, the Action Agencies prepared a biological assessment (BA) allegedly assessing the effects of covered activities on the grouse.[41] The Action Agencies submitted the BA to FWS to determine whether the authorized actions may adversely affect the

---

[33] *Id.*

[34] *Id.*

[35] U.S. Fish and Wildlife Service, Threatened Status for Gunnison Sage-Grouse; Final Rule, 79 Fed. Reg. 69,192, 69,193–69,200 (Nov. 20, 2014).

[36] *See Colorado by & Through Colorado Dep't of Nat. Res., v. United States Fish & Wildlife Serv.*, 362 F. Supp. 3d 951, 970 (D. Colo. 2018). Sixty-five percent of occupied Gunnison sage-grouse habitat in the Gunnison Basin is grazed under federal grazing permits, primarily on BLM lands. Livestock grazing on BLM lands has contributed to Gunnison sage-grouse habitat generally being in poor condition in the Gunnison Basin. At the time of listing, as much as 81 percent of all occupied habitat in the Gunnison Basin was not meeting required land health standards. *See* Charlie Sharp, Fish and Wildlife Biologist, U.S. Fish & Wildlife Service, Key Excerpts of the Final Listing Rule for Coordination w BLM (April 2, 2014) (attached as Ex. B).

[37] *See* Ex. A.

[38] *Id.*

[39] *Colorado Dep't of Nat. Res.*, 362 F. Supp. 3d at 974–75.

[40] *Id.* at 975.

[41] Gunnison Basin Candidate Conservation Agreement Programmatic Biological Assessment: Gunnison Sage-Grouse (*Centrocercus minimus*) (BA) (Apr. 10, 2013).

Gunnison sage-grouse and its proposed critical habitat.[42] FWS concluded in an initial conference opinion that the proposed action was not likely to jeopardize the continued existence of Gunnison sage-grouse or adversely modify its critical habitat.[43]

Subsequently, following the Gunnison sage-grouse's listing in 2014, BLM requested that FWS adopt the Conference Opinion as its biological opinion and, on December 8, 2014, FWS complied, resulting in the BiOp at issue in this letter.[44] The BiOp is effective for 20 years and applies within Gunnison sage-grouse occupied critical habitat in the Gunnison Basin.[45] Although the BiOp found that some of the activities authorized by the Gunnison Basin CCA, including grazing, were likely to adversely affect the Gunnison sage-grouse, the BiOp concluded that they would not jeopardize the continued existence of the species based on the assumption that Gunnison Basin CCA's conservation measures would reduce impacts to Gunnison sage-grouse by an estimated 95 percent.[46]

These conservation measures, amongst other obligations, require the Action Agencies to conduct short- and long-term habitat monitoring.[47] "At a minimum," agencies must determine whether allotments are meeting or not meeting the 2005 RCP habitat guidelines for herbaceous heights, which are to be incorporated into grazing permits.[48] If herbaceous heights are being

---

[42] Submission of "Gunnison Basin Candidate Conservation Agreement Programmatic Biological Assessment: Gunnison Sage-Grouse (April 12, 2013).

[43] Conference Opinion for the Gunnison Basin Candidate Conservation Agreement and Effects on Gunnison Sage-Grouse, 17 (July 30, 2013) (Conference Opinion). The Conference Opinion applies to all or part of the following BLM grazing allotments containing occupied Gunnison sage-grouse habitat: Alder Creek Common, Antelope Creek, Barrett Creek, Beaver Creek, Big Draw, Big Willow, Black Sage, Blinberry Gulch, Cabin Creek Common, Camp Kettle Gulch, Cochetopa Canyon, Cochetopa Creek, County Line, Coyote Hill, Dome Pasture, Doyleville, Doyleville Common, East Moss Lake, Gold Basin, Goose Creek, Harris EU, Holly Cochran, Hot Springs Creek, Huntsman Mesa, Indian Creek, Iola, Line Spring, Little Willow, Los Ocho, Los Pinos Creek, Lower Cochetopa Common, Lower Means, Manchego, McIntosh, Mesa, Mill Creek Common, Mill Hill Common, Muddy/Poison, Needle Creek, Ohio Creek, Pine Mesa, Pleasant View, Powderhorn Common, Razor Creek, Razor Creek Dome, Rock Creek, South Parlin Flats Common, Sapinero Mesa, Sheeps Gulch Common, Snyder Gulch, Spooky Mountain, Stevens Creek Common, Stubbs Gulch, Stueben Creek, Ten Mile Springs Common, Texas Creek, Tomichi, Tomichi Dome, Trail Creek, Upper Means, Van Tassel Gulch, Vouga Reservoir, West Antelope Common, West Gunnison, West Pass Creek, Waunita Hot Springs, and Woods Gulch Common.

[44] Adoption of the Gunnison Basin Candidate Conservation Agreement Conference Opinion as the Final Biological Opinion (Dec. 8, 2014).

[45] BiOp at 2.

[46] *Id.* at 27 n.j., 29 n.j. The BiOp found that implementation of the Gunnison Basin CCA will result in take of 77 Gunnison sage-grouse over the 20-year life of the Gunnison Basin CCA; 35 of these 77 from livestock grazing. *Id.* at 26, 28.

[47] BA at 103–115.

[48] BA at 111. The 2005 RCP guidelines for herbaceous heights, incorporated into the BiOp, require grass heights of 3.9-5.9 inches, grass cover of 10-40 percent (depending on habitat

met, the agency must collect herbaceous heights and photo points once every three years; if not, the agency must conduct "trigger monitoring" (which includes utilization monitoring) and collect herbaceous heights and photo points annually immediately following livestock use.[49] If the guidelines are not met, the BiOp also contemplates reductions in stocking levels or other long-term adjustments to grazing permits.

Additionally, the BiOp requires the Action Agencies to immediately report any known injury or mortality of Gunnison sage-grouse, or losses of nests or eggs, resulting from implementation of the Gunnison Basin CCA; track incidental take (defined as future use disturbance) by land use type with respect to the 20-year disturbance limits; and provide that information in annual reports.[50] Annual incidental take from grazing is presumed to stay static because the amount of take is based on the acreage of lands grazed annually, which the BiOp assumed will not change over the 20-year period governed by the BiOp.[51]

Unfortunately, adoption of the Gunnison Basin CCA has not led to an improvement in the status of the Gunnison sage-grouse or its habitat. Rather, the Gunnison Basin population has dramatically declined. Lek surveys conducted by Colorado Parks and Wildlife (CPW) detected only 363 males in 2019, down from 848 in 2013 (when the Gunnison Basin CCA was developed).[52] And while numbers rebounded slightly in 2020 with 449 males detected, this is still well below numbers detected in 2013.[53] Based on high male counts compiled annually by CPW and the best available science, the estimated Gunnison sage-grouse population for the Gunnison Basin has declined from 3,149 in 2013 to only 1,667 in 2020—over a 40 percent decline in just six years.[54] The three-year average high male count for Gunnison sage-grouse in the Gunnison Basin in 2020 is the lowest it has been since lek count methods were standardized in 1998.[55]

Despite these ongoing declines, the Action Agencies have failed to adhere to the BiOp's annual reporting requirements, and have renewed many livestock grazing permits within

---

type), forb height of 2-5.9 inches in breeding habitat or 1.2-5.9 inches in summer fall/habitat, and forb cover of 5-40 percent (depending on habitat type). 2005 RCP at H-6.
[49] BA at 112.
[50] Id. at 19–20.
[51] See BiOp, Appx. B. Id. at Id. at 27 n.l., 29 n.l.
[52] See Ex. A.
[53] Id.
[54] See Ex. A. High male counts do not capture every male in the population. However, the best available science demonstrates that they capture between 77 percent and 93 percent of the population—far more than the outdated 53 percent assumed by FWS and the action agencies. See Fremgen et al. (2016) and Coates et al. (2019). As such, the Center and WWPs reached their population estimates by relying on more recent studies and the expert opinion of Dr. Clait Braun, a preeminent expert on Gunnison sage-grouse who utilizes a conservative assumption that high male counts capture 70 percent of all males in a total population. When this assumption is combined with a sex ratio of 1.6 females for every male, an estimate of the Gunnison Basin population can be made based on the best available scientific data.
[55] Id.

occupied habitat without incorporating the Gunnison Basin CCA's terms and conditions.[56] Even where terms and conditions have been incorporated, grazing has continued unaltered despite failures to meet Gunnison sage-grouse habitat requirements.[57] As such, the Action Agencies have turned the BiOp's requirements to protect Gunnison sage-grouse into a paper exercise.

## III.    VIOLATIONS OF LAW

### A.    The Agencies Must Reinitiate Consultation Over the Effects of Grazing in the Gunnison Basin on Gunnison Sage-grouse.

The agencies must reinitiate consultation over the Gunnison Basin CCA because "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered" and "the identified action [has been] subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion or written concurrence."[58] In particular, the Gunnison sage-grouse has undergone severe declines in the Gunnison Basin, new scientific information undermines the assumptions underlying the BiOp, and the agencies have failed to incorporate terms and conditions into livestock grazing allotment permits or adhere to the BiOp's annual reporting requirements. In light of this, the amount of take specified in the ITS has likely been exceeded, similarly requiring the immediate reinitiation of consultation.[59] The agencies' failure to do so violates the ESA, and until consultation is reinitiated and completed, the Action Agencies must halt any activities previously authorized under the BiOp and refrain from making any irreversible or irretrievable commitment of resources that would foreclose the formulation or implementation of any reasonable and prudent alternative measures.[60]

---

[56] A grazing-related annual report received in response to a Freedom of Information Act Request found that eight of twenty survey transects were not meeting forb cover requirements, and two did not achieve desired graminoid heights. Land health assessments from 2017-2018 also show Gunnison sage-grouse habitat requirements not being met or else not being assessed in key occupied habitats. Despite this, BLM has renewed permits on many of the subject allotments in occupied Gunnison sage-grouse habitat, Sheeps Gulch Common (Permits 0503278, 0504030); Black Sage (Permit 0504112); Powderhorn Common (Permit 0503868, 0503338, 0500047); Mesa, Texas Creek, Cold Springs, and Dome Pasture (Permit 0503261); Big Draw (Permit 0500473); Doyleville Common (0503321); Razor Creek and Waunita Hot Springs (Permit 0503915); Woods Gulch Common (Permit 0503924); and Sapinero Mesa and Goose Creek (Permit 0503251). Permits for Ohio Creek; Camp Kettle Gulch; Coyote Hill and Barrett Creek; Cabin and Alder Creek; West Pass Creek; Tomichi Dome, Mill Hill Common, and Needle Creek; Huntsman Mesa were renewed without the incorporation or required terms and conditions.

[57] A non-exhaustive list of such failings is summarized in Appendix A.

[58] 50 C.F.R. § 402.16(a)(2-3).

[59] *Id.* § 402.16(a)(1).

[60] *Id.* § 402.16(a)(2), (3).

     i.       New Information Regarding the Effects of Grazing Authorized by Gunnison Basin CCA Requires Immediate Reinitiation of Consultation.

Severe declines in Gunnison sage-grouse numbers demonstrate that activities like grazing covered by the Gunnison Basin CCA are likely impacting Gunnison sage-grouse in a manner not previously considered and constitute new information necessitating reinitiation of consultation. Lek surveys conducted by CPW recorded a high male count of only 363 males in 2019. This is the lowest number of birds in the Gunnison Basin population since lek counts began in the 1990s. And while numbers rebounded slightly in 2020, only 449 were detected. Based on this data, the estimated Gunnison sage-grouse population for the Gunnison Basin declined from 3,149 in 2013 to only 1,667 in 2020—over a 40 percent population decline in the six years since the Gunnison Basin CCA was developed.[61] Similarly, the 3-year running average for the total Gunnison Basin population of grouse has declined in the past three years: 2,869 in 2018; 2,167 in 2019; and 1,788 in 2020.[62]

This significant decline places the species' future in doubt. The Gunnison Basin CCA itself recognized such a tipping point, stating that if "during the lifetime of the CCA, … the 3-year moving average of the Gunnison Basin population declines toward a population estimate of 2000 birds a) over two consecutive years, or b) over a 5-year period, CCA signatories will revisit the conservation measures and management actions outlined in the CCA."[63] Reinitiation is necessary because "if a series of population estimates for a given population continually declines toward a threshold, managers should increase efforts to evaluate the decline and potential conservation actions *before* the population passes the threshold."[64] Unfortunately, the threshold for reinitiation contemplated in the Gunnison Basin CCA has come and gone.

New scientific information also reveals threats to Gunnison sage-grouse from grazing that were not adequately addressed in the BiOp and confirms the inadequacy of its conservation measures. For instance, the best available science now indicates that cheatgrass, the spread of which is exacerbated by grazing, harms Gunnison sage-grouse and adversely modifies its critical habitat in a manner not considered in the BiOp by reducing the presence of sagebrush, perennial grasses, and forbs, and by increasing the frequency and intensity of fire.[65] New scientific information also confirms that the 2005 RCP habitat standards incorporated into the

---

[61] *See attached* Ex. A (listing CPW's annual high male count per population and the 3-year running average); *see also* fn. 54 (detailing how population estimates have been calculated).
[62] *Id.*
[63] Gunnison Basin CCA at 49–50.
[64] *Id.* at 49 (emphasis added).
[65] BLM, Environmental Impact Statement for Domestic Sheep Grazing Permit Renewals, 54 (Dec. 2019); Williamson et al. 2019 at pp. 664; *Id.*; *see also* 79 Fed. Reg. at 69214 (noting that an increase in cheatgrass can further alter Gunnison sage-grouse habitat due to the increased potential it creates for wildfires).

BiOp are inadequate to protect Gunnison sage-grouse.[66] The agencies thus must reinitiate consultation immediately.[67]

> ii.    The Action Agencies' Failure to Adhere to the Terms and Conditions of the Biological Opinion Requires Immediate Reinitiation of Consultation.

The Action Agencies' failure to adhere to multiple terms and conditions of the BiOp additionally requires the immediate reinitiation of consultation because this constitutes a change in the action to the detriment of the species.[68] Specifically, the BiOp required the Action Agencies to track incidental take by land type with respect to the 20-year disturbance limits and provide such information in annual reports.[69] The 20-year disturbance limits cannot be exceeded.[70] The Action Agencies are also required to annually report the number of grazing permits renewed, along with an assessment of habitat conditions for each renewed permit, and

---

[66] Jankowski et al. (2014) documented that sage-grouse exhibited higher levels of corticosteroids in grazed areas—meaning, essentially, that they were stressed. A 2014 study confirmed that maintaining 7-inch grass height, especially during drought—like that occurring in Colorado for the past several years—is positively correlated with successful nests. *See* Doherty et al. (2014). Beschta et al. (2012) and (2014) explained that the influence of climate change is likely to exacerbate the harmful ecological effects of livestock grazing. Monroe et al. (2017) also concluded that grazing timing and intensity can have profound impacts on sage-grouse populations. Similarly, Holechek (1999) (as discussed in Braun (2006)) remains the best available science regarding the amount of forage utilization sage-grouse can tolerate—25-30 percent, not 40-60 percent as allowed under the RCP. *See* 2005 RCP at 117–18 (assuming Gunnison sage-grouse can tolerate utilization above 50 percent). Stiver et al. (2015) confirm that sage-grouse need 18 cm (7 inch) grass height in all brood-rearing and nesting habitats and that this number should not be altered unless scientific evidence definitively confirms the threshold is inappropriate.

[67] Science released since the development of the Gunnison Basin CCA undermines one of the key assumptions the BiOp relies on to monitor the Gunnison sage-grouse population. Namely, the Gunnison Basin CCA relies on a population model from the 2005 RCP which assumes that high male counts actually represent "only 53% of the male population."[67] However, the best available science now shows that high male counts account for between 77 percent and 93 percent of the male population—suggesting that the population model enshrined in the 2005 RCP significantly *overestimates* population size. In doing so, the Gunnison Basin CCA only requires reinitiation if the 3-year running average high male count approaches 400—80 birds (or nearly 20 percent) fewer than 2020's historically low 3-year running average and 50 percent fewer than the high male count in 2014, the year the species was listed as threatened under the ESA. *See* Ex. A. At that point reinitiation would likely be pointless as the Gunnison sage-grouse would likely have passed below the threshold of recovery.

[68] *Ctr. For Native Ecosystems v. Cables*, 509 F.3d 1310, 1325 (10th Cir. 2007) (noting that reinitiation would be required if a biological opinion required "utilization levels to be met in order for the concurrence to remain valid, (2) utilization levels were not monitored as specified by the FWS, and (3) the monitoring that was conducted showed excess utilization").

[69] BiOp at 19–20.

[70] *Id.* at 19.

the results of short-term monitoring tracking herbaceous height data, photo point data, any addition environmental data, and whether permits modified to incorporate sage-grouse habitat guidelines and standards are meeting such standards.[71] However, based on requests under the Freedom of Information Act, the Action Agencies have failed to adhere to these annual reporting requirements. As such, "the identified action [has been] subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion or written concurrence," and the agencies must immediately reinitiate consultation.[72]

> iii.    The Amount of Take Set Forth in the Biological Opinion has been Exceeded.

The Gunnison sage-grouse's population decline in Gunnison Basin far exceeds the amount of take set forth in the BiOp's ITS. The BiOp found that implementation of the Gunnison Basin CCA will result in take of just 77 Gunnison sage-grouse over the 20-year life of the Gunnison Basin CCA; 35 of these 77 from livestock grazing.[73] However, since the Gunnison Basin CCA's adoption, the Gunnison Basin population has lost approximately 1,482 birds—nearly 20 times the amount set forth in the ITS. In light of this, it is likely that "the amount or extent of taking specified in the incidental take statement [has been] exceeded," requiring the immediate reinitiation of consultation.

> **B.    The Action Agencies' Continued Authorization of Grazing Under the Gunnison Basin CCA, Continued Reliance on the Biological Opinion Despite the Gunnison Sage-grouse's Decline, and Failure to Implement Required Conservation Measures Jeopardizes the Gunnison Sage-grouse, Adversely Modifies Its Critical Habitat, and Results in Unauthorized Take.**

The Action Agencies' continued authorization of grazing in occupied habitat in the Gunnison Basin under the coverage of the Gunnison Basin CCA, in the face of the Gunnison sage-grouse's decline and despite their failure to adhere to the BiOp's annual reporting requirements and required conservation measures, jeopardizes the Gunnison sage-grouse's survival and recovery, adversely modifies its occupied critical habitat, and results in unauthorized take. As the BiOp recognized, grazing adversely affects Gunnison sage-grouse and it was only through the implementation of conservation measures that the Action Agencies could "avoid, minimize, or offset these effects."[74] However, as noted above, the Action Agencies have failed to carry out these conservation measures.

For instance, even where grazing monitoring has occurred, grass and forb height and cover standards for Gunnison sage-grouse are frequently not being met.[75] Rather than address these failures, BLM has arbitrarily written them off as unrelated to livestock grazing or else not

[71] *Id.* at 19–20.
[72] 50 C.F.R. § 402.16(a)(3).
[73] BiOp at 26, 28.
[74] *Id.* at 13.
[75] *See, e.g.,* Bureau of Land Management, Environmental Assessment, Allotment Management Plan/Environmental Assessment for Livestock Grazing on the Mesa, Texas Creek, Cold Springs, and Dome Pasture Allotments, 26 (August, 2019).

warranting reductions to stocking levels.[76] As a result, the BiOp's unwarranted assumption that conservation measures would reduce "take" from grazing by 95 percent can no longer stand because those measures are not being implemented. In light of this, the Action Agencies' reliance on an arbitrary and capricious BiOp and ITS to authorize grazing in the Gunnison Basin jeopardizes the continued survival and recovery of the species, adversely modifies its critical habitat, and results in unauthorized take.

### C.   The Biological Opinion is Arbitrary and Capricious, Fails to Ensure Against Jeopardy and the Adverse Modification of Critical Habitat, and Violates the ESA.

Because it fails to adequately account for the effects of grazing on the Gunnison sage-grouse and its critical habitat, and relies on inadequate conservation measures and unsupported assumptions regarding their efficacy to write off these impacts, the BiOp is arbitrary and capricious. Its analysis of the environmental baseline and the cumulative effects impacting the species within occupied habitat in the Gunnison Basin is similarly deficient. Additionally, the BiOp failed to meaningfully consider how the Gunnison Basin CCA's implementation will affect the species' recovery. These defects render the BiOp arbitrary and capricious, in violation of the ESA, and the Action Agencies' reliance on the BiOp violates their duty to ensure that the actions authorized by the Gunnison Basin CCA do not jeopardize the continued existence of the Gunnison sage-grouse or adversely modify its critical habitat.[77]

The BiOp's analysis of grazing's impacts on Gunnison sage-grouse is woefully inadequate, underestimating the impacts of grazing and ignoring the best available science indicating that one out of every six encounters with livestock likely results in partial nest-depredation.[78] Similarly, the BiOp's estimation that only 35 birds will be taken by livestock grazing over the next 20 years severely underestimates grazing's impacts by relying on unsupported assumptions that take will only occur on a quarter of all lands impacted by grazing and that conservation measures will reduce that take by 95 percent.[79] At no point do the agencies provide any support for these assumptions, which are contrary to the best available science indicating that the conservation measures enshrined in the Gunnison Basin CCA are inadequate to ensure the species' survival and recovery.[80] The BiOp also fails to account for the

---

[76] *See, e.g., id.* at 25 (assuming failure to meet minimum grass height was related to inadequate sample size and monitoring being conducted during a drought year).

[77] 16 U.S.C. § 1536(a)(2).

[78] *See* Coates 2007, p. 28. The BiOp also only analyzed the impacts of *cattle* grazing on the grouse, ignoring the specific and significant impacts of *sheep* grazing in the Gunnison Basin. Specifically, sheep grazing can negatively impact sage-grouse winter habitat, result in lower nesting densities, and cause higher rates of nest depredation than that addressed in the BiOp. Boyd et al. (2014) at 64. Indeed, sheep grazing in previously ungrazed areas has been found to have a significantly greater impact than cattle grazing resulting in lower adult numbers and negatively impacting native vegetation. Jenkins, D., & Watson, A. Bird numbers in relation to grazing on a grouse moor from 1957–61 to 1988–98. *Bird Study*, *48*, 18–22 (2001).

[79] BiOp at 27 n.l, j., 29 n.l, j.

[80] For instance, the herbaceous heights requirements in the 2005 RCP, enshrined in the BiOp, establish a 3.9 to 5.9 inch grass height standard despite the best available science demonstrating

adverse impacts grazing has on Gunnison sage-grouse critical habitat resulting in the impairment of essential behavioral patterns.[81] Its failure to do so renders the BiOp arbitrary and capricious and the Action Agencies' reliance on it a violation of the ESA.

The BiOp also failed to adequately assess the environmental baseline by failing to consider the past and present impacts from agriculture, large-scale water development and irrigation, and climate change.[82] Instead, the BiOp simply listed ongoing activities such as agricultural production, hunting, "and others[,]" as part of the environmental baseline with no analysis.[83] But the agencies cannot fulfill their duty to consider the effects of the proposed action when added to the environmental baseline "by simply listing the relevant activities or by narrowly defining the action area to exclude federal activities that are impacting" the species.[84] It must analyze them.[85]

Similarly, the BiOp's cumulative impacts analysis is startlingly insufficient.[86] Despite noting that "residential development, agricultural production, State and county road maintenance activities, vehicle traffic on area roads, livestock grazing, hunting, and human infrastructure" will all take place within the action area, the BiOp simply concluded, without elaboration, that "[e]ach of these activities has the potential to affect Gunnison sage-grouse and its habitat."[87] Again, FWS is required to do more than simply state potential cumulative effects,

---

that Gunnison sage-grouse require a minimum of approximately 8 inches of grass height for nesting and brood rearing. *Compare see* Connolly et al.(2000b) pp. 971 *with* 2005 RCP at H-3 to H-8. Stiver et al. (2015) confirmed that a grass height of at least 7 inches is required to promote sage-grouse persistence in nesting and brood-rearing habitats. The 2005 RCP also allows for 50-60 percent utilization by cattle in Gunnison sage-grouse habitats, while Dr. Clait E. Braun, former avian program manager for CPW and Gunnison sage-grouse expert, has stated that in order to provide for the Gunnison sage-grouse's survival and recovery, grazing should be excluded from lands that produce less than 200 pounds per acre of herbaceous vegetation per year, that utilization in sage-grouse habitat be limited to 25 to 30 percent, that livestock be excluded before June 20 and after August 1 to leave at least 70 percent of herbaceous production each year to form cover for sage-grouse, and that winter grazing should generally occur between November 15 to March 1. Braun (2006).

[81] Mack 1981, pp. 148–149; *see also* Williamson et al. 2019, pp. 1; Reisner et al. 2013; Final Listing Determination, 79 Fed. Reg. 69206, 69214; Connelly et al. 2004, pp. 7–31, and references therein.; Young and Allen 1997, p. 531; 79 Fed. Reg. 69244; Beck & Mitchell, 2000; GSRSC 2005.

[82] Species Status Assessment Report for the Gunnison Sage-Grouse (*Centrocercus minimus*) at 96.

[83] BiOp at 7.

[84] *Defs. of Wildlife v. Babbitt*, 130 F. Supp. 2d 121, 126 (D.D.C. 2001).

[85] *Id.*

[86] "Cumulative effects are those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation." 50 C.F.R. § 402.02.

[87] BiOp at 17.

it must analyze them.[88] For instance, FWS must consider the impacts of a county permitting process that has resulted in numerous developments being permitted within key Gunnison sage-grouse habitats, resulting in the displacement of birds.

Finally, the BiOp analysis of recovery is woefully inadequate as it states, without support, that "[i]mplementation of the proposed conservation measures will advance the recovery of the species and result in a net increase in available habitat to the species over the long term."[89] However, the proposed conservation and mitigation measures are accounted for in the ITS and the BiOp requires no net increase in habitat impacted by grazing.[90] Thus, since FWS determined—even after taking the proposed conservation and mitigation measures into account—that the activities covered by the Gunnison Basin CCA are "likely to adversely affect" the Gunnison sage-grouse, the Gunnison Basin CCA will not bring the species "to the point at which the measures provided pursuant to this Act are no longer necessary."[91] The BiOp's failure to analyze the effects of the activities authorized by the Gunnison Basin CCA and BiOp on the Gunnison sage-grouse's survival and recovery, the environmental baseline, and the cumulative impacts of other activities impacting the Gunnison sage-grouse within occupied habitat in the Gunnison Basin renders it arbitrary and capricious. As such, the Action Agencies' reliance on it to ensure that the actions authorized by the Gunnison Basin CCA will not jeopardize the Gunnison sage-grouse or adversely modify its critical habitat violates the ESA.

---

[88] *See Nat'l Wildlife Fed'n v. Norton*, 332 F. Supp. 2d 170, 179 (D.D.C. 2004); *Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1036 (9th Cir. 2001) (finding a biological opinion arbitrary and capricious when the record contains no consideration of cumulative impacts).

[89] *Id.* at 19. A biological opinion is required to analyze whether a project is likely "to reduce appreciably the likelihood of both the survival *and recovery* of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02; *see also Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 931 (9th Cir. 2008) (concluding that the "jeopardy regulation requires [the expert agency, in this case FWS,] to consider both recovery and survival impacts"). Regarding whether a project adversely modifies a species' critical habitat, FWS must also consider whether the project appreciably diminishes the habitat's capacity to support and enable the species' recovery because "the purpose of establishing 'critical habitat' is for the government to carve out territory that is not only necessary for the species' survival but also essential for the species' recovery." *Gifford Pinchot*, 378 F.3d at 1070.

[90] BiOp at 19.

[91] *Id.* at 2; 16 U.S.C. § 1532(3).

## <u>CONCLUSION</u>

For these reasons, the agencies' failure to reinitiate consultation and their continued reliance on the BiOp is arbitrary and capricious, and violates the ESA, and the undersigned will file suit unless the legal violations detailed herein are remedied within 60 days.


Sincerely,

<u>/s/ Ryan Adair Shannon</u>
Ryan Adair Shannon
Staff Attorney, Center for Biological Diversity
P.O. Box 11374
Portland, OR 97211
971-717-6407
rshannon@biologicaldiversity.org

<u>/s/ Talasi Brooks</u>
Talasi Brooks
Staff Attorney, Western Watersheds Project
P.O. Box 2863
Boise, ID 83701
(208) 336-9077
tbrooks@westernwatersheds.org

**Accompanying Literature**

Coates, Peter S., Gregory T. Wann, Gifford L. Gillette, Mark A. Ricca, Brian G. Prochazka, John P. Severson, Katie M. Andrle, Shawn P. Espinosa, Michael L. Casazza, David J. Delehanty. 2019. "Estimating sightability of greater sage-grouse at leks using an aerial infrared system and *N*-mixture models." *Wildlife Biology*: 1–12.

Fremgen, Aleshia L., Christopher P. Hansen, Mark A. Rumble, R. Scott Gamo, Joshua J. Millspaugh. 2016. "Male Greater Sage-Grouse Detectability on Leks." *The Journal of Wildlife Management*: 266–274

Monroe, Adrian P., Cameron L. Aldridge, Timothy J. Assal, Kari E. Veblen, David A Pyke, Michael L. Casazza. 2017. "Patterns in Greater Sage-grouse population dynamics correspond with public grazing records at broad scales." *Ecological Applications*, 0(0), 2017, 1–12.

Williamson, Matthew A., Eric Fleishman, Ralp C. Mac Nally, Jeanne C. Chambers, Bethany A. Bradley, David S. Dobkin, David I. Board, Frank A. Fogarty, Ned Horning, Matthias Leu, Martha Wohlfeil Zillig. 2019. "Fire, livestock grazing, topography, and precipitation affect occurrence and prevalence of cheatgrass (*Bromus tectorum*) in the central Great Basin, USA." *Biol Invasions* 22, 663–680 (2020).





WWP Idaho
PO Box 2863
Boise, ID 83701
(208) 336-9077
tbrooks@westernwatersheds.org

*Working to protect and restore
Western Watersheds and Wildlife*

**APPENDIX A**

The following summaries describe BLM's failures to follow through on its commitment to protect Gunnison sage-grouse through altering harmful livestock grazing[92]:

- In 2008 BLM conducted an Environmental Assessment (EA) and Rangeland Health Assessment (RHA[93]) prior to renewing the Doyleville Common Allotment grazing permits and found that four of five Colorado Standards for Public Land Health were not being met and that no significant progress was being made towards meeting two of the standards. Doyleville Common Permit EA, 2 (2008). In 2019, BLM renewed grazing permits on that allotment without further analysis, and without considering whether ecological conditions on that allotment had improved. Permit 0503321, 0503914.

- In 2008 BLM conducted an EA on a group of allotments that included the McIntosh Mountain Allotment. This allotment is entirely within Gunnison sage-grouse occupied critical habitat as well as an Area of Critical Environmental Concern (ACEC) designated to protect wildlife, includes three leks, and is in poor ecological condition, with only 25% of transects achieving Gunnison sage-grouse habitat standards and the allotment generally within an "Improve" category. McIntosh Mountain EA, 10, 32. The EA claimed that if continued grazing management demonstrated failure to achieve objectives, adjustments would be made as necessary. *Id.* at 34. Without further mention of resource conditions, including considering the status of the Gunnison sage-grouse leks on the allotment, BLM renewed the permit in 2018. Permit 0500139, 0500140.

- In 2008 BLM conducted an EA and RHA prior to renewing the Razor Creek Allotment grazing permit and found that three of five Colorado Standards for Public Land Health were not being met due to historic livestock grazing and that current livestock grazing was preventing the allotment from moving towards achieving standards. Razor Creek EA, 2, 5. Two land health assessments found the allotment failed Standard 4 for wildlife due to lack of herbaceous understory that Gunnison sage-grouse need for hiding cover. *Id.* at 12. The EA also noted that livestock trespass had been a recurring problem and contributed to degraded conditions. *Id.* at 15. The EA concluded that adoption of the preferred alternative, which included resting the allotment from spring grazing every other year, would help make slow progress towards desired conditions. *Id.* at 7, 21. But, BLM renewed the permit in 2019 without any further assessment of whether ecological conditions on the allotment had improved. Permit 0503915.

---

[92] The examples here are based upon information provided by the agencies through the Freedom of Information Act. The undersigned recognize that the information may not be complete, but these summaries are based on the best of the information we have been provided.

[93] It appears that BLM has used "Rangeland Health Assessments" and "Land Health Assessments" interchangeably. We attempt to use whichever term BLM used to identify the document at issue.

- In 2008 BLM conducted an EA and RHA prior to renewing the Woods Gulch Common Allotment grazing permits and found that four of the five Colorado Standards for Public Land Health were not being met and no progress was being made towards meeting them. Woods Gulch Common Allotment EA, 2. The primary cause of the failures was historic livestock grazing and current livestock grazing was preventing progress towards meeting standards. *Id*. The entire allotment is within designated occupied critical habitat and it contains two leks—one active and one inactive. *Id*. at 15. The EA claims that conditions will improve under the proposed action so long as the permittee adheres strictly to the current proposed stocking rate and management guidelines. *Id*. at 16. Without determining whether conditions had improved or considering permittee compliance, BLM nevertheless renewed the permit in 2019. Permit 0503924.

- In 2008, BLM completed a RHA for the Texas Creek Allotment. Even though the allotment contains occupied Gunnison sage-grouse habitat, the assessment states: "Mapping indicates no nesting, early brood rearing, or winter habitat." It also states: "There is little sagebrush on the allotment therefore there is little habitat available for sage grouse." Thus it concluded the allotment was achieving Standard 4. A new permit to graze the Texas Creek Allotment was issued in 2019, without incorporating terms and conditions to protect Gunnison sage-grouse.  Permit 0503261.

- In 2008 BLM completed a RHA for the Van Tassel Gulch Allotment. The assessment found "The long season of grazing appears to keep the bunchgrasses at a short height …. Much of the allotment was grazed such that bunchgrasses were less than 4 inches in 2008." In 2014, BLM also completed an EA and FONSI to support grazing permit renewal for Van Tassel Gulch, which proposed to authorize the same number of AUMs for the allotment, but to require grazing to move through a series of pastures throughout the season. The one-paragraph Gunnison sage-grouse analysis stated that while there were no known leks on the allotment, there was a lek within 4 miles of the allotment, and the entire allotment was in occupied habitat. With respect to habitat conditions it stated: "The majority of the allotment is lacking sagebrush cover but there is adequate cover in the lower part of the Van Tassel Gulch Pasture. Currently the Arizona fescue cover has been reduced through season long grazing and bare ground is high in several of the pastures. This reduces habitat for several of the life stages of the grouse." 2013 Van Tassel EA, 11. It claimed that implementing the pasture system would "move these communities in a direction that would continue to provide habitat and cover for sage grouse." *Id*.

- In 2018, BLM completed a Determination of NEPA Adequacy (DNA) to support grazing permit renewals for Van Tassel and Los Ocho Allotments. The DNA stated "Grazing use for the allotment will be in compliance with…the Gunnison Sage-Grouse CCA." It incorporated utilization and stubble height standards from the CCA/RCP. However, it did not otherwise discuss Gunnison sage-grouse except to state that the operative LHA found that livestock grazing was only causing .3 acres in Van Tassel Creek to exceed standards and claim that simply removing grazing would not result in improvement to that site. It did not discuss failures to achieve grass height standards the 2008 LHA had measured and the 2014 EA had discussed, or whether the adjusted grazing system under the 2014 EA had improved Gunnison sage-grouse habitat as it had been projected to do.

19

- In 2018 BLM completed a Categorical Exclusion (CX) covering grazing permit renewal for Bead Cr., Cochetopa Cr., County Line, Los Pinos Cr., Muddy/Poison, Razor Cr. Dome, Rock Cr., and Trail Cr. The CX contained a discussion of Gunnison sage-grouse that was nearly identical to the one in the Zone 3 LHA, except that instead of recognizing that the allotment was not meeting grass height standards on inventoried transects, it claimed that "grass heights were minimally adequate to support GUSG with average heights of 4.8 inches +/- 2.3 standard deviation in the allotments being considered for permit renewal." BLM, Categorical Exclusion, DOI-BLM-CO-F070-2018-005-CX. Of 4 plots considered to determine whether suitable seasonal habitat existed within the allotments, 3 were considered unsuitable because there was less than 5 percent sagebrush cover. Nevertheless, the CX did not consider any adjustments to grazing necessary to meet Gunnison sage-grouse needs.

- In 2019 BLM conducted an EA related to the renewal of grazing permits for the Mesa, Texas Creek, Dome Pasture, and Cold Springs Allotments. Each allotment lies at least partly within Gunnison sage-grouse occupied critical habitat, and lies within 4 miles of an active lek. Snyder EA, 26. The EA claims that much of the habitat in the allotments is not suitable for Gunnison sage-grouse because it is not a big sagebrush habitat type. *Id*. at 26. In addition, it states that grass height in the big sagebrush transects that had been assessed were not adequate to support Gunnison sage-grouse with all but one measuring below 4 inches. *Id*. Consequently, the EA recognizes no need to improve habitat conditions for Gunnison sage-grouse by altering grazing and addresses effects to Gunnison sage-grouse from grazing by incorporating the Gunnison Basin CCA terms and conditions into grazing permits along with "adaptive management".

- Beginning in 2019, BLM also conducted an environmental impact statement (EIS) related to renewal of grazing permits for the American Lake, Henson Creek, Amerian Flats, West Powderhorn, Devils Lake, Cox Park, Alpine Plateau, Sapinero Mesa, and Goose Creek allotments. Over 80 percent of the Sapinero Mesa Allotment and all of the Goose Creek Allotment are occupied Gunnison sage-grouse critical habitat. Gunnison sheep grazing EIS, 52. Both allotments are invaded by cheatgrass, which is especially dominant within sheep bedding grounds in sage-grouse breeding habitat, and degrades sage-grouse habitat. *Id*. They also suffer from other degradation detailed in the Zone 7 LHA and have not been inventoried for sage-grouse habitat quality. Nevertheless, the EIS considers no Alternative more protective of Gunnison sage-grouse and states that "there is no difference" between the action alternatives' effects on Gunnison sage-grouse and their habitat. *Id*. at 54. It concludes: "Meeting the CCA and RMP guidelines should result in moderate grazing, which may have localized impacts on Gunnison sage-grouse, but should not result in a downward population trend in the analysis area." *Id*. at 55. Because the allotments have not been monitored, however, there is no evidence they are meeting the Gunnison Basin CCA/RMP guidelines. We believe that BLM intends to reissue the Sapinero Mesa and Goose Creek grazing permits despite these problems and without imposing any additional measures to protect Gunnison sage-grouse or improve their habitat.

- In addition, between 2013 and 2019 approximately 25 grazing permits authorizing grazing in high value Gunnison sage-grouse habitats were issued under FLPMA Section 402, without any NEPA analysis and, in some cases, without incorporating terms and conditions to protect Gunnison sage-grouse.

## Declaration of Dr. Clait E. Braun

1.      My name is Clait E. Braun, and I have personal knowledge and expertise regarding the measures necessary to protect Gunnison Sage-Grouse populations and habitats from irreparable harm. I have been studying Gunnison Sage-Grouse since 1977 and advocating for their protection for 20+ years.

### Education and Professional Experiences

2.      I have a B.S. in Technical Agronomy from Kansas State University, a M.S. in Wildlife Management from the University of Montana, and a Ph.D. in Wildlife Biology from Colorado State University. In addition, I am a Certified Wildlife Biologist and have attended numerous short courses, workshops, technical sessions, etc., to remain current in my professional work.

3.      I worked for the Colorado Division of Wildlife for thirty years, from 1969–99. I was hired as a Wildlife Researcher and moved through competitive exams to Wildlife Research Leader and then to Avian Research Program Manager. I have also worked as a soil scientist in Kansas and Montana, in 1961 and 1964, respectively, and for the Montana Department of Fish and Game, in 1965. In addition, I taught several soils and wildlife-focused courses from 1963–65 at the University of Montana. I taught similar courses at Colorado State University from 1966–69.

4.      I have been an invited lecturer at more than 20 U.S. and Canadian universities. I have presented lectures on sage-grouse at Paul Smith College, Colorado State University, Cornell University, Montana State University, Principia College, Kansas State University, and the University of Arizona, among others.

5.      I have published over 340 scholarly articles. While I was working for the Colorado Division of Wildlife, our Research Section achieved national recognition from The Wildlife Society winning the 1986 Group Achievement Award, partly due to my publications and travel to meetings and symposia, which raised the profile of our agency.

6.      My field research has focused primarily on bird species, especially grouse (1965–2019). I conducted and directed research on sage-grouse throughout Colorado from 1973 through 1999. Through my research on sage-grouse, I have become familiar with sagebrush steppe ecosystems, the plant species that comprise them, and the wildlife species that inhabit and depend on them, throughout all western states and Canadian provinces.

**Professional Career Studying Gunnison Sage-Grouse**

7.      I am considered one of the world's leading experts on Gunnison Sage-Grouse and their habitats, as I have been involved with research on the species since 1977. Over the course of my career, I have published over 130 scholarly articles about sage-grouse, including Gunnison Sage-Grouse.

8.      I originally observed that sage-grouse in the Gunnison Basin were "different" from other sage-grouse in October 1977. As a result, I conducted and supported extensive research on these birds starting in the early 1980s and continuing through June 1999, when I retired from the Colorado Division of Wildlife. My research and the research I was involved with supported the recognition of Gunnison Sage-Grouse as a distinct species of sage-grouse.

9.      More specifically, my work on Gunnison Sage-Grouse in the Gunnison Basin included analysis of population dynamics based on examination of counts of males

on leks and wings from hunter-harvested birds. I also directed and supported graduate studies focused on sage-grouse in Gunnison and Saguache counties in the Gunnison Basin, at Crawford in Delta and Montrose counties, at Dove Creek in Dolores County, at Glade Park-Pinon Mesa in Mesa County, near Miramonte Reservoir, Hamilton Mesa, and Dry Creek Basin in San Miguel County, and at Poncha Pass in Saguache County.

10.     The research I worked on with graduate students led to the scientific consensus that sage-grouse in southwestern Colorado are a different species. The Gunnison Sage-Grouse qualifies for species designation based on genetics, behaviors, morphometrics (measurements of parts of the body), and use of different habitats from what is now known as the Greater Sage-Grouse.

11.     Based upon these findings, I co-authored the description of sage-grouse in this area that resulted in acceptance of the Gunnison Sage-Grouse as a new species in 2000:

**Young, J. R., C. E. Braun, S. J. Oyler-McCance, J. W. Hupp, and T. W. Quinn. 2000. A new species of sage-grouse (Phasianidae: *Centrocercus*) from southwestern Colorado. Wilson Bulletin 112: 445-453**.

Release of the species description was delayed so that specific Conservation Plans for each of subpopulations could be developed. The Colorado Division of Wildlife was made aware of all findings and the need for rapid protection of the habitats used by all subpopulations.

12.     I retired from the Colorado Division of Wildlife in mid-1999. Since "retiring", I have completed 4 contracts to edit and produce books. I have also reviewed and prepared detailed analyses of numerous environmental analysis documents and resource management plans. I served as Editor of the Wilson Journal of Ornithology from mid-2006 through 2012 (24 Issues, over 1200 manuscripts processed). I have continued my research on sage-grouse and other bird species as well.

13.     Since "retiring", I work on grouse in Colorado normally during two periods (May and August) each year. This work has included observations of Gunnison Sage-Grouse and their habitat in Dolores, Gunnison, and San Miguel counties as well as other counties where this species once occurred. I am familiar with all areas where Gunnison Sage-Grouse presently occur, their habitats, population trends dating from the late 1970s through the present, and threats to their continued persistence.

14.     My ability to continue research on Gunnison Sage-Grouse depends upon their continued persistence in their natural habitats.

15.     I continue to be actively involved with literature research on Gunnison Sage-Grouse. More specifically, I prepare my data on Gunnison Sage-Grouse for publication, prepare Op-Ed articles, advise others on Gunnison Sage-Grouse issues (habitats, management, biology, philosophy, etc.) and reasonable solutions, respond to questions from writers and others interested in Gunnison Sage-Grouse, and inform responsible individuals and groups about the status of Gunnison Sage-Grouse.

16.     I have been the senior or coauthor of six recent papers on Gunnison Sage-Grouse.

Braun, C. E., S. J. Oyler-McCance, J. A. Nehring, M. L. Commons, J. R. Young, and K. M. Potter. 2014. The historical distribution of Gunnison Sage-Grouse in Colorado. Wilson Journal of Ornithology 126:207-217.

Braun, C. E. 2014. In My Opinion: Conservation plans and the future of sage-grouse in Colorado, USA. Grouse News 47:6-7.

Braun, C. E., D. A. Budeau, and M. A. Schroeder. 2015. Fall population structure of Sage-Grouse in Colorado and Oregon. Oregon Department of Fish and Wildlife, Wildlife Technical Bulletin 005.

Braun, C. E. and S. O. Williams III. 2015. History of Sage-Grouse in New Mexico. The Southwestern Naturalist 60:207-212.

Young, J. R, C. E. Braun, S. J. Oyler McCance, C. L.  Aldridge, P. A. Magee, and M. A. Schroeder. 2015. Gunnison Sage-Grouse. Species Account. The Birds of North America. Number 721. Cornell University, Ithaca, New York.

Connelly, J. W., C. E. Braun, and M. A. Schroeder. 2019. Sage-Grouse population declines: Species in crisis and agencies in denial. Grouse News 58: 7-11.

**The Decline of Gunnison Sage-Grouse**

17.     I was aware that sage-grouse in the Gunnison Basin and elsewhere in southwestern Colorado would be recognized as a new species by the early 1990s based on work by J. W. Hupp, J. R. Young and myself. I prepared and published a paper (cited below) in early 1995 on the status of all sage-grouse in Colorado. That paper illustrated the distribution of sage-grouse in Colorado by counties and categorized populations by counties as persistent (> 500 breeding birds), and at risk of extirpation (< 500 breeding birds). Of all the counties in southwestern Colorado, only Gunnison County was included as persistent. This was the first effort to provide an estimate of how many sage-grouse were still present in Colorado. I knew at that time that Gunnison Sage-Grouse, which had yet to be recognized as a distinct species, were rapidly becoming extirpated. This information was relayed to the top administrators in the Colorado Division of Wildlife. Most did not seem to be concerned and most did not believe it merited species status. It continued to be listed as a game species and to be legally hunted.

Braun, C. E. 1995. Distribution and status of sage grouse in Colorado. Prairie Naturalist 27: 1-9.

18.     I continued to work with the sage-grouse in southwestern Colorado after publication of the 1995 paper and was able to convince administrators of the Colorado Division of Wildlife that Conservation Plans for all sage-grouse populations in Colorado should be developed starting with those in the Gunnison Basin. This project was underway by 1995 and the Gunnison offices of the Bureau of Land Management ("BLM") and U.S. Forest Service ("FS")

agreed to join in the effort. The first plan (Gunnison Basin) was completed in June 1997 and was followed in 1998 by a plan for the small population at Crawford, then by plans (separately) for sage-grouse at Dove Creek, San Miguel Basin, Pinon Mesa-Glade Park, and Poncha Pass. The top administrators in the Colorado Division of Wildlife were concerned that too much control was granted to the Local Working Groups.

19.     During the entire period I continued to monitor Gunnison Sage-Grouse numbers and watched as populations disappeared from Sims Mesa (Montrose County), Ridgeway (Ouray County), an area northwest of Cortez in Montezuma County, and a few other locales. None of the top administrators in the Colorado Division of Wildlife were overly concerned as they remained unconvinced that sage-grouse in southwest Colorado were a distinct species. Most areas with small populations were closed to hunting but illegal hunting continued in some locations without being of large concern to upper level administrators as the illegal harvest mostly occurred during hunting seasons for big game (mule deer and elk) on private lands.

20.     During the entire period from 1990 to early 1999 important habitats for Gunnison Sage-Grouse on private lands continued to be lost to development with little expressed concern by agency officials. It was obvious what was happening but those responsible for wildlife and their habitats in southwest Colorado seem to have the approach that little could be done to slow development. This approach continued as I retired, but changed in 2000 when the Gunnison Sage-Grouse was described and accepted as a new species.

21.     By 2000, it was too late to successfully restore most if not all of the small populations of Gunnison Sage-Grouse through habitat management and acquisition. The

1990-2000 interval was a period of disbelief by Federal and State agencies, as well as local groups, that a new species of sage-grouse had been discovered in southwestern Colorado, even though I and others repeatedly demonstrated by talks, reports, and then publications that it a was real species with unique traits.

22.     However, shortly after my colleagues and I identified the Gunnison Sage-Grouse as a separate species, on January 18, 2000, the U.S. Fish and Wildlife Service ("Service") placed it on the Endangered Species Act ("ESA") candidate species list. When it did so, it assigned it a listing priority of "2," recognizing the high-magnitude and imminent threats to the bird's survival and persistence. Just a few days later, on January 26, 2000—not knowing that the Service had placed it on its candidate species list—several interested parties petitioned the Service to list the Gunnison Sage-Grouse as a threatened or endangered species. Regardless, the petition was important because species can languish on the candidate species list for decades as the ESA's stringent deadlines only apply to petitions.

23.     Following the petition, the Colorado Division of Wildlife hired 2 research biologists to work on sage-grouse after I retired. Both conducted studies in the Gunnison Basin and contributed to the development of the "Gunnison Sage-Grouse Rangewide Conservation Plan" released in 2005. This effort served to focus attention on certain sage-grouse needs, but it has not been successful in changing local priorities in land uses within most counties, and did not stop the decline in size of the small populations. I was not asked to help with preparation of the 2005 Rangewide Plan, although I did provide written comments on it.

24.     Based on this 2005 Rangewide Plan, the Service found that listing the Gunnison Sage-Grouse was "not warranted" in 2006. 71 Fed. Reg. 19,954 (Apr. 18, 2006). Following litigation challenging this determination, the Service agreed to make a new 12-month finding.

However, again, rather than provide the Gunnison Sage-Grouse with the protections it needed, the Service found that listing the Gunnison Sage-Grouse was warranted but precluded by higher priority actions.

25.     As the result of separate litigation, the Service agreed to finally make another final determination regarding whether the Gunnison Sage-Grouse should be listed pursuant to the ESA. At long last, the Service proposed listing the Gunnison Sage-Grouse as an endangered species on Friday, January 11, 2013. Endangered Status for Gunnison Sage-Grouse; Proposed Rule, 78 Fed. Reg. 2,486.

26.     Nearly two years later, the Service backtracked from their original proposal and listed the Gunnison Sage-Grouse as a threatened species under the ESA on November 20, 2014. Although I believed that the species should have been listed as endangered, in line with the Service's proposal, I was relieved that it finally received the protections of the ESA. When the Service listed the Gunnison Sage-Grouse as threatened, it recognized the impact that grazing has had on the Gunnison Sage-Grouse's habitat. 79 Fed. Reg. 69,192.

27.     The primary reason for listing was the destruction of the species' habitat. Indeed, Gunnison Sage-Grouse populations have collapsed with the destruction of their habitat and they currently occupy only 10% (down from 12% at the time of listing) of their historic range due to overgrazing, agriculture, residential, and commercial development. Species Status Assessment ("SSA") at 16, 19.

28.     When the Service listed the Gunnison Sage-Grouse as threatened in 2014 only 4,705 Gunnison Sage-Grouse persisted in the wild, in seven populations. The Gunnison Basin population alone comprised 84 percent of all remaining Gunnison Sage-

Grouse. The six smaller populations (San Miguel, Monticello-Dove Creek, Pinon Mesa, Cerro Summit-Cimarron-Sims Mesa, Crawford, and Poncha Pass) numbered only 206, 98, 182, 74, 157, and 10 birds, respectively in 2014. As the Service conceded when listing the species, there were fewer Gunnison Sage-Grouse remaining than the 5,000 birds needed to maintain a healthy population. *See* Aldridge and Brigham 2003, Traill et al. 2010.

29.     One of the basis on which the Service avoided listing the Gunnison Sage-Grouse as endangered, rather than threatened, was the supposed protections provided by the Gunnison Basin Candidate Conservation Agreement ("Gunnison Basin CCA") which the Service alleged alleviated some of the habitat-based threats for the species. At the same time, however, the Service concluded that the Gunnison Basin CCA did not alleviate all habitat-based threats and was uncertain about how effective it would be.

30.     Indeed, although the Gunnison Basin CCA includes guidelines regarding rangeland health standards, a majority of grazing allotments in the Gunnison Basin are failing to meet Rangeland Health thresholds. BLM Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS at 3-75.

31.     Critically, the implementation of the Gunnison Basin CCA and the uses it authorizes take place against the backdrop of potentially catastrophic declines in the Gunnison Basin population. Although the Gunnison Basin population is the largest and most resilient population of Gunnison Sage-Grouse, I estimate that only approximately 1,500 Sage-Grouse remained in the Gunnison Basin following a harsh winter in 2019. This estimate is based on a count done by Colorado Parks and Wildlife ("CPW") which counted 363 males in the Gunnison Basin in 2019. A reasonable estimate is that 70 to 75% of all males are counted. Taking the conservative estimate, that would mean that there were likely approximately 519 total males in

the Gunnison Basin population in the spring of 2019. The sex ratio in the long-term

harvest data for the Gunnison Basin indicate there are 1.6 females for every male

(combining adults and yearlings). Therefore, with 519 males present, we would expect

about 830 hens in the population. Taken together, I estimate, based on my experience and

expertise, that there were approximately 1,349 grouse in the Gunnison Basin in 2019.

Using the same metrics, and based off of CPW's counts for prior years, the total

population for the Gunnison Basin over the last eight years is as follows: 2013 = 3,149;

2014 = 3,013; 2015 = 3,617; 2016 = 3,455; 2017 = 2,805; 2018 = 2,348; 2019 = 1,349;

2020 = 1,667.

      32.    The Gunnison Basin population's numbers have been steadily and steeply

declining since 2016 with only a slight rise in 2020. The 2019 numbers, the lowest on

record, are shocking. While grouse populations naturally fluctuate year to year, these

numbers are a wake-up call that the species is in desperate need of help. If these declines

continue, we could see the species enter an extinction vortex.

      33.    Notably, the Gunnison Basin CCA states that "during the lifetime of the

CCA, if the 3-year moving average of the Gunnison Basin population declines toward a

population estimate of 2000 a) over two consecutive years or b) over a 5-year period,

CCA signatories will revisit the conservation measures and management actions outline

in the CCA." That time has come, as the 2018 3-year moving average was 2,869, the

2019 3-year moving average was 2,167, and the 2020 3-year moving average is 1,788.

**Need for Adequate Protections for Gunnison Sage-Grouse**

      34.    Given these dire population numbers, the time for action is now and the

Service, BLM, FS, and the National Park Service ("NPS") should reinitiate consultation

on the Gunnison Basin CCA. The failure to do so will result in irreparable harm to the species as we must take every action necessary to prevent the species from entering into an extinction vortex and to protect the largest remaining population of the species.

35.     Additionally, given the widespread threats to Gunnison Sage-Grouse from livestock-related factors including lack of suitable grass cover for brood-rearing and cheatgrass incursion, livestock use should be reduced for all populations, and specific concrete measures should be adopted such as closing allotments, reducing AUMs, and/or reducing annual stocking levels and/or utilization levels. If the agencies were to take the threat of extinction seriously, they should allow no grazing within occupied and suitable habitat within four miles (6.4 kilometers) of currently active leks, as defined in Priority 1 Action 2a (Draft Recovery Plan at 14) between March 1 and August 1 (so that grazing is not occurring during the mating, nesting, and brood-rearing seasons) and between November 15 and March 1 (when plant growth has ceased for the year). Such actions would be in line with a 2014 memorandum drafted by BLM that considered reducing or eliminating grazing in occupied Gunnison Sage-Grouse habitat.

36.     More specifically, the Service, FS, BLM, and NPS should adopt a comprehensive strategy to minimize and eliminate impacts from livestock grazing, including but not limited to enforcing a 7-inch stubble height requirement (Connelly et al. 2000, Hagen et al. 2007, Prather 2010), requiring closure of grazing permits that are voluntarily retired, limiting livestock permittees to a maximum of 25% forage utilization (Braun 2006), encouraging range riders, eliminating barbed wire fencing, and enforcing drought restrictions.

37.     The survival and recovery of the Gunnison Sage-Grouse in its natural habitat is important to me, as I originally discovered that it is 'different' from other sage-grouse, co-authored the original descriptions that identified it as a new species, and continue to study the

species. I have devoted much of my career and life to studying this bird and its habitats
and advocating for their protection. My ability to continue my life's work of studying the
Gunnison Sage-Grouse and its habitats depends upon the persistence and recovery of the
Gunnison Sage-Grouse in the wild.

38.     The Gunnison Sage-Grouse's survival as a species is also important to
society as it occupies a unique niche and is representative of a unique and once abundant
habitat type. Loss of this iconic representative of the sagebrush steppe would eliminate all
sage-grouse south of north-central Colorado. This loss would be irreplaceable and the
species' unique set of genetic material, behaviors, and habitat adaptations would be lost
forever.

Date: September 21, 2020                    Signature: _Clait E. Braun_